```
                IN THE UNITED STATES DISTRICT COURT
                OF THE EASTERN DISTRICT OF VIRGINIA
                          Richmond Division
   ************************************************************
   NYEISHA S. GHEE,

                Plaintiff,
        v.                              Civil Action Number
                                        3:25-cv-17-RCY
   PINETREE APARTMENTS, LLC,

                Defendant.
   ************************************************************




            VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

                         NADRA YOHANNES

                        January 6, 2026






              HALASZ REPORTING & VIDEOCONFERENCE

              1011 East Main Street, Suite 100

                    Richmond, Virginia 23219

                         (804) 708-0025





   STENOGRAPHICALLY REPORTED BY: GWENDA APPLEGATE, RMR-CRR
```

Page 65

```
 1              was marked for identification)
 2
 3    BY MR. KRUDYS:
 4        Q    Do you -- this is a photo of Ms. Ghee and
 5    her deceased son Mark obviously before the fire.
 6        A    Okay.
 7        Q    Did you -- did you ever know, meet her?
 8        A    No.
 9        Q    Did -- did you know that she was a tenant
10    at the time?
11        A    No.
12        Q    The -- did you hear of the fire?
13        A    It was on the news.  Yes.
14        Q    All right.  And at that time Ms. Fatone was
15    serving in your role; is that correct?
16        A    Miss who?
17        Q    I might pronounce -- Kaitlin?
18        A    Yes, Kaitlin, uh-huh.
19        Q    Yeah.  Did -- did you ever talk to her
20    about the fire?
21        A    No.
22        Q    Okay.  Did you ever visit the property
23    after the fire?
24        A    No.
25        Q    Did you -- did you ever reach out to
```

```
 1
 2              (Plaintiff's Deposition Exhibit 6
 3               was marked for identification)
 4
 5   BY MR. KRUDYS:
 6       Q    So this is Ms. Bugg's sworn statement.  She
 7   talks at paragraph 10 about "There was termite damage
 8   above the sliding glass door to my bedroom as well as
 9   above the sliding glass door to my mother's bedroom.
10   The termite damage above the sliding glass door in my
11   mother's bedroom was more noticeable.  Also I saw
12   termite damage to the beam supporting the G7's wooden
13   patio deck."  That would be the deck above hers.
14            And then if you look at paragraph 12, it
15   would talk about many small holes in the wood above
16   the sliding glass door.
17            And in paragraph 16, she says, "I did not
18   see Pinetree ever repair the termite damage."
19            Did you ever know of termite damage to
20   apartment G8 during the time that you served as the
21   regional -- I mean as the -- the regional manager?
22       A    Not to my recollection, no.
23       Q    So if -- if any type of termite damage was
24   to be addressed or was addressed by Pinetree
25   maintenance personnel, you would agree with me that
```

Page 80

```
 1   owned by Beachwold and managed by South Oxford; is
 2   that right?
 3        A    Those complaints were made at other
 4   properties, yes.
 5        Q    Okay.  Do -- do you know what was causing
 6   the moisture to come around the sliding glass doors?
 7        A    I do not.  I don't have expertise in that
 8   department.
 9        Q    We took the deposition of Mr. Norris.  And
10   he said that on over a dozen times, contractors were
11   come in -- would be brought in to replace, among
12   other things, flashing around sliding glass doors.
13             Did you know of that work?
14        A    I'm aware that some work was done, yes.
15        Q    All right.  Why was water getting in by the
16   flashing around sliding glass doors, if you know?
17        A    I don't.  I'm -- that's not my expertise.
18        Q    Well, both Mr. Norris and Mr. McConnell
19   testified that it was because the flashing was
20   improperly installed.
21             Were you ever told that, when you were the
22   regional manager, that the flashing around the
23   sliding glass doors was improperly installed?
24        A    I'm sure I was made aware if it was entered
25   into a proposal from a contractor.
```

```
 1            My question is:  When you're finding it so
 2   prevalently, why didn't you go in and inspect all
 3   around the sliding glass doors to see if there was
 4   that damage to the jack studs and to the headers?
 5            MR. KENNEDY:  Object to the form.
 6            THE WITNESS:  Sixteen times out of 144
 7      units would not require removing the drywall
 8      from 144 units.  And though I'm no construction
 9      specialist, I would assume you would need to
10      remove the drywall in able to -- in order to see
11      the -- the studs and supporting wood or
12      what-have you.
13   BY MR. KRUDYS:
14      Q    Now, most of the time they're going in from
15   the outside.  They're removing the siding.  Then they
16   take the Tyvek and they see the problem.  You can
17   approach it from the outside.
18      A    Again, I'm not a construction specialist.
19   But you would have to remove a portion of the
20   building to look for damage that you're not able to
21   see visibly; correct?
22      Q    And that would have saved Ms. Ghee's son's
23   life and would have kept her skin from being burned
24   off her face.  So isn't that a justifiable cost to
25   spend?
```

Page 179

```
 1              MR. KENNEDY:  Object to the form.
 2              THE WITNESS:  I don't know anything about
 3       the cause of the fire so I cannot suppose what
 4       would have prevented it.
 5   BY MR. KRUDYS:
 6       Q    Well, it's not about preventing the fire,
 7   it's about escaping from a fire.  If the sliding
 8   glass --
 9       A    I don't know the details, sir.
10       Q    All right.  Well --
11       A    I don't know the details.  And I'd rather
12   not.
13       Q    Well, you knew about rotten headers above
14   sliding glass doors; right?
15              MR. KENNEDY:  Object to the form.
16              THE WITNESS:  I knew it was found in some
17       of the repairs that were done.
18   BY MR. KRUDYS:
19       Q    Why do you think a header, a wood beam is
20   placed across a sliding glass door?  It's to provide
21   support; right?
22              MR. KENNEDY:  Object to the form.
23              THE WITNESS:  I don't know.  I'm not a
24       construction specialist.
25
```

Page 180

```
 1   BY MR. KRUDYS:
 2       Q   Well, it doesn't take a construction
 3   specialist to know that the 2X4s, the 2X6s, the
 4   headers and all, are to provide support; correct?
 5       A   Again, I'm not in construction.  I'm not a
 6   builder.
 7           MR. KRUDYS:  We'll take a -- a two-minute
 8       break.
 9           THE VIDEOGRAPHER:  Going off the record at
10       1:26 p.m.
11
12           (Recess)
13
14           THE VIDEOGRAPHER:  Going back on the record
15       at 1:27 p.m.
16           MR. KRUDYS:  All right.  You told us about
17       your formal stop at 1:30.  We're going to
18       respect that.  We do have additional questions,
19       but we're going to stop at this time.  We
20       appreciate your time and attention.  We wish you
21       the best until we see you again.
22           We'll be in contact through your counsel
23       concerning that, but we greatly appreciate your
24       time and attention, and we wish you a good day.
25           THE WITNESS:  Thank you.
```