**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

NYEISHA S. GHEE,

      Plaintiff,

                                  Civil Action No.: 3:26-cv-00158-RCY

      v.

PINETREE APARTMENTS, LLC, *et al.*,

      Defendants.

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO REMAND**

Plaintiff Nyeisha S. Ghee, by counsel, files this Memorandum in Support of Motion to Remand, and states as follows:

**I.    SUMMARY**

Defendants Pinetree Apartments, LLC ("Pinetree"), Clearfield/Pinetree Apartments, LLC, Beachwold Partners, LP, Beachwold Holdings, LLC, Beachwold Residential, LLC, South Oxford Management, LLC ("South Oxford"), Nadra Yohannes ("Yohannes"), Ricky McConnell ("McConnell"), and Alvin Peebles ("Peebles"), (collectively referred to herein as the "Beachwold Defendants") had no legal basis to remove this case to federal court. It is the Plaintiff's privilege to plead the jurisdictional basis for their complaint.[1] And "in a case such as this one, where the district court's original jurisdiction [upon removal] is premised on diversity of citizenship, an action is not removable where one or more of the defendants is a resident of the state in which

---

[1] The plaintiff is "the master of the complaint," and generally has the right to choose whether to proceed in federal or state court. *Hain Celestial Group, Inc. v. Palmquist*, 607 U.S. __, No. 24-724 (U.S. Feb. 24, 2026) (quoting *Royal Canin U. S. A., Inc.* v. *Wullschleger*, 604 U. S. 22, 35 (2025).

the suit was filed." *Grennell v. Western Southern Life Ins. Co.,* 298 F.Supp.2d 390 (S.D.W.V. 2004) (citing 28 U.S.C. § 1441(a)).  During the relevant period, Defendants Yohannes, McConnell, and Peebles (collectively the "Individual Defendants") and Defendant PestNow of Central Virginia, LLC (hereinafter "PestNow") were residents of the Commonwealth of Virginia, as was the Plaintiff Ms. Ghee. Therefore, complete diversity does not exist between the adverse parties in this case, and so this Court lacks jurisdiction.

Moreover, the Beachwold Defendants' assertion that the Individual Defendants and PestNow have been "fraudulently joined" is flat out wrong. *See* ECF No. 1 (hereinafter "Notice"), at 2, 10, and 18. These Defendants all took actions that caused Ms. Ghee's injuries and are properly included as defendants in the action.

## II.    FACTS ASSERTED IN THE COMPLAINT

### A.    Introduction.

The state court complaint (ECF No. 1-2, hereinafter the "Complaint" or "Compl.")[2] states that for years, tenants flooded Pinetree manager's inboxes and voicemails with complaints about water leaking through the walls surrounding patio sliding glass doors. Compl. ¶ 4. They included photos and videos showing damaged carpets and mold. *Id.* The Complaint asserts that management knew about the issues, including around Ms. Ghee's Primary Bedroom sliding glass door, but chose cosmetic fixes over proper repairs. *Id*. ¶ 5. In Ms. Ghee's apartment, Defendants McConnell and/or Peebles painted over termite holes the day before she moved in. *Id.* Ms. Ghee only realized the problem during the fire on February 20, 2024. *Id.*

---

[2] The state court complaint (ECF No. 1-2, hereinafter "Complaint" or "Compl.") is nearly identical to the Third Amended Complaint in the original federal case, *Nyeisha S. Ghee v. Pinetree Apartments, LLC, et al.*, Civil Action No. 3:25-cv-017, E.D. Va. 2025 (hereinafter "Original Federal Case"), ECF No. 52.

2

Defendant PestNow contributed to Ms. Ghee's injuries by applying termiticide only to Building G's exterior without inspecting or treating interior units, neglecting to treat joint areas, and letting uncertified technicians apply chemicals at the perimeter of Building G. *Id.* ¶ 6. In this fashion PestNow knowingly skirted laws meant to protect the public, causing Ms. Ghee's injuries and Mark's death by allowing the termite damage to go unchecked in the wooden framing that held the sliding glass door in place in the back wall of Unit G8's Primary Bedroom. *Id.*

At page 8 of their Notice, the Beachwold Defendants admit they have gone outside the Complaint's four corners, selectively quoting from deposition testimony. Notice, at 8. Although that is an improper practice in the context of this motion, the Beachwold Defendants have done so, and so Plaintiff must respond accordingly.[3]

### B. Yohannes, McConnell, and Peebles knew of the issues that caused Ms. Ghee's injuries.

Defendants Yohannes, McConnell, and Peebles knew about the issues that caused Ms. Ghee's injuries—water infiltration, termites, and wood rot near balcony/patio sliding doors. William Norris, a South Oxford Maintenance Technician, testified tenants had complained for years. Compl. ¶ 43. Moisture entered the units and walls when it rained. *Id*. Diane Taylor, a previous resident, reported black mold in Unit G8. *Id.* McConnell said water intrusion was due to improperly installed flashing. *Id.* ¶ 69. Norris explained that the building contractor failed to flash the door properly, causing water to go behind the vinyl instead of away from the building. *Id.* This

---

[3] Plaintiff asserts that citing to the entire record is not appropriate when ruling on a motion to remand. *See Edmonds v. Harris*, No. 3:22cv496, 2023 U.S. Dist. LEXIS 40135 (E.D. Va. Mar. 9, 2023) (citing *Allard v. Laroya*, 163 F. Supp. 3d 309, 312 (E.D. Va. 2019)). Using evidence outside the complaint is only appropriate when a plaintiff seeks to add new nondiverse parties *after* a case has been removed to federal court. *See Edmonds,* at 1004 (discussing *AIDS Counseling and Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000 (4th Cir. 1990)). However, out of an abundance of caution and to respond to the Beachwold Defendants' assertions, Plaintiff will cite to discovery materials as well to demonstrate why remand is appropriate here.

3

problem had been known since at least 2018, with multiple inspections confirming improper flashing. *Id.*

Not only did Defendants McConnell and Peebles know of the water damage, but as maintenance technicians, they also were aware of termite infestations in Pinetree buildings. For example, on February 5, 2021, a tenant in Unit F6 reported insects that looked like termites, claiming they had taken over and were crawling on the kitchen and bathroom floors. *Id.* ¶ 61. Norris, a South Oxford employee, reported bugs resembling flying ants. *Id.* On February 17, 2021, a PestNow technician found swarmer termites in Unit F6's bathroom tub. *Id.*

**C.    Defendant Yohannes was well aware of the structural problems at the complex.**

Defendant Nadra Yohannes, the South Oxford Regional Manager overseeing Pinetree Apartments, also knew of the foregoing issues as tenant complaints reached her. She coordinated with PestNow and subcontractors reporting structural damage near sliding glass doors. *Id.* ¶¶ 19, 60, 62, 94, 130.

Representative of Yohannes' knowledge and involvement, on December 29, 2021, Pinetree Manager Dionne Mason emailed Yohannes about repairs for the E1 patio door, citing contractor reliability issues and potential fines affecting property relations. *Id.* ¶ 94.

In April 2022, Yohannes told Beachwold executive Rob Glass that Unit O10 had severe water damage around patio doors, similar to other units' issues, with invoices noting repairs like replacing supporting beams and flashing to fix leaks. *Id.* ¶ 130.

On March 8, 2023, Property Manager Crystal Spruill informed Yohannes that Unit C8 was infested with termites. *Id.* ¶ 62. PestNow invoiced the complex for cockroach treatments and found live termites in C8, performing warranty treatment there, but did not inspect the other units in Building C for termites. *Id.*

4

The repairs discussed in the Complaint required, at a minimum, removing the vinyl siding around the door, repairing or replacing the flashing, and replacing the vinyl siding. *Id.* ¶ 95. Often, these repairs also involved removing and replacing water-damaged drywall. *Id.* Dozens of instances show even more extensive damage to the wooden framing supporting sliding glass doors.[4] This is the same type of damage that was hidden in the rear wall of Ms. Ghee's Primary

[4] The chart below illustrates select documented occurrences of water and termite damage to the wood structures supporting the sliding glass doors at Pinetree Apartments. The words "rotten" and "decaying" were regularly noted by contractors.

| Date | Unit | Description | Reference |
|---|---|---|---|
| 2/26/2019 | E3 | termites eating through wood into interior drywall | Compl. ¶¶ 51-52, 96 n. 11; s*ee also id.* ¶ 130. |
| 3/13/2019 | N1 | live termites in unit interior and termite damage to wall studs | Compl. ¶¶ 56, 98-99. |
| 7/12/2019 | F7 | "wood rotten" around balcony sliding glass door | Select Pinetree Apartments work orders attached as **Exhibit 1**, at 1. |
| 7/16/2019 | N1 | bandboard needs replacing due to water damage | Compl. ¶ 70; *see also id.* ¶ 56. |
| 4/1/2020 | C3 | sliding glass door dripping water, discolored wood | Exhibit 1, at 2. |
| 8/26/2020 | D3, D8, F1, G1, K1, O3, O6, O8 | Water damage to sliding glass doors; contractor recommended removing and replacing entire door | Compl. ¶¶ 71, 101. |
| 9/8/2020 | multiple unknown units | "rotten and decaying" fascia boards and water leaks around sliding glass doors | Email from William Norris to Defendant Yohannes, attached as **Exhibit 2**. |
| 9/15/2021 | H5 | water damaged fascia board, contractor recommended replacement | Compl. ¶ 74. |
| 10/5/2021 | E1 | sliding glass door improperly fitted and swollen from "constant contact with water" | Compl. ¶ 67; *see also id.* ¶¶ 75-76. |
| 2/8/2022 | D3 | "hole in the wall" by sliding glass door "from previous leak that never got repaired" | Exhibit 1, at 3; s*ee also* Compl. ¶¶ 101, 130, 81. |
| 3/4/2022 | E1 (and possibly E2) | "Rotten Framing" | Compl. ¶¶ 75-76; *see also id.* ¶ 67. |

Bedroom. *Id.* As South Oxford's Regional Manager, Yohannes was at the center of these issues, but she, like McConnell and Peebles, undertook to hide these problems from Ms. Ghee and the other tenants.

### D.    The Beachwold Defendants concealed termite damage in Unit G8.

From 2017 to mid-2019, Donisha Bugg lived in Unit G8, the same unit assigned to Ms. Ghee's family by South Oxford. *Id.* ¶ 26. During her tenancy, Bugg observed termite damage above the sliding glass doors to her and her mother's bedrooms, as well as small holes in the wood above these doors. *Id.* She saw insects that she believed were termites three to four times; she

| 4/20/2022 | O10 | water damage structural repair, included replacing studs in wall and header above sliding glass door | Compl. ¶¶ 77, 130; *see also id.* ¶¶ 81, 85. |
|---|---|---|---|
| 5/23/2022 | P1 | replaced rotten header above door, removed rotten door jack, replaced rotten two by fours in the wall | Compl. ¶ 78. |
| 6/21/2022 | F8 | cut out rotten header above sliding glass door and replaced header | Compl. ¶ 79; *see also id.* ¶ 46. |
| 8/2/2022 | C12 | replaced water-damaged header above sliding glass door | Compl. ¶ 80. |
| 8/2/2022 | D3 | replaced water-damaged header above sliding glass door | Compl. ¶ 81. |
| 6/26/2023 | K8 | replaced rotten wood above primary bedroom sliding glass door | Compl. ¶ 86. |
| 10/31/2023 | H1 | "Replaced all rotted Celtics [Celotex] with half-inch OSB Tyveked exterior wall..." | Compl. ¶ 88; *see also id.* ¶ 44.h. |
| 12/4/2023 | J6 | "Replaced flashing and installed tyvex on exterior wall….Repaired Sheetrock on wall around patio door." | Compl. ¶ 89. |
| 5/30/2024 | H3 | "...removed double 2 x 10 rotten header removed section of rotten wall plate on top replaced two studs in the wall also replaced jackstand for header rebuilt 2 x 10 header…" | Compl. ¶ 91. |

6

notified the Beachwold Defendants about termite issues several times but saw no evidence the damage was repaired. *Id.*

The Petersburg Redevelopment and Housing Authority ("PRHA") inspects housing before tenants move in. *Id.* ¶ 27. On May 24, 2022, PRHA's Marrietta Paschal inspected G8. It failed due to severe chipping paint and difficulty opening the sliding doors. Paschal noted the Primary Bedroom sliding door "can't open," as well as chipping paint around the second bedroom sliding door. *Id.*

After the inspection, on May 31, 2022, South Oxford employees made multiple high-priority work orders for repairs to G8, including to fix windows that were hard to open and to fix chipping paint. *Id.* ¶¶ 28-29. But Beachwold Defendants McConnell and/or Peebles merely painted over the chipping paint, thereby covering the termite damage in the drywall and wood trim. *Id.* ¶¶ 29, 130. The termite damage was not addressed, only painted over.

On the same day, a work order noted issues with the sliding door locks in G8. *Id.* ¶ 30. Repairing the locks would have required sliding the doors, meaning the repairers would have noticed if the doors did not slide easily. The Complaint asserts that the doors were only lubricated, not truly repaired. *Id.* ¶ 31. No further work was done after May 31, 2022. *Id.* ¶ 32.

On June 1, 2022, two South Oxford employees showed Ms. Ghee a walkthrough of G8, but she was not informed of any of these issues and was otherwise unaware of them. *Id.* ¶ 33.

**E.      PestNow knowingly violated state law and the standard of care.**

The Complaint states that termiticide instructions required inspecting the interior of a building if its exterior was treated. *Id.* ¶ 53. However, PestNow only inspected interiors if it was already inside for other pest control or if requested by the Beachwold Defendants. *Id.* Most times, they made no such request. *Id.*

7

Each Pinetree Apartment building is built on a main slab with adjoining slabs. *Id.* ¶ 54. When PestNow applied termiticide, the termiticide label required drilling holes between slabs, but PestNow did not do this. *Id.*

PestNow technicians also applied termiticide at Pinetree Apartments without being Certified Applicators, as required by Virginia Code § 3.2–3932. The deposition transcript shows technician Jeff Zalinski[5] was not certified. *Id.* ¶ 55. PestNow did not follow label instructions during and after the fire to address termite infestations. *Id.*

## III.    PROCEDURAL HISTORY

The Plaintiff filed the Complaint in the Circuit Court of the City of Petersburg on February 3, 2026, alleging fraud, concealment of a latent defect, failure to maintain the back wall (an area in the control of the Beachwold Defendants), violations of the Virginia Consumer Protection Act, negligence and negligence *per se*, and private nuisance. The Defendants were served with the Complaint beginning on February 6, 2026.

On February 27, 2026, the Beachwold Defendants removed this action, claiming that this Court has subject matter jurisdiction on the basis of diversity, pursuant to 28 U.S.C. § 1332(a). Notice, at 3. In their Notice, the Beachwold Defendants recognize that there is not complete diversity in the matter, but argue that the Nondiverse Defendants were fraudulently joined. Notice, at 5, 10-14, 18.

## IV.    APPLICABLE LEGAL STANDARDS

The Beachwold Defendants base their removal upon diversity jurisdiction. *Id.* 28  U.S.C. § 1332 requires "complete diversity among parties, meaning that the citizenship of every plaintiff must

---

[5] Zalinski was not merely a technician who worked for PestNow; he was also a part owner during the last five years before the fire. Deposition transcript of PestNow's Rule 30(b)(6) representative Jeffrey R. Huber, attached as **Exhibit 3**, at 8:23-9:11.

8

be different from the citizenship of every defendant." *Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).

If a plaintiff files an action in state court with respect to a matter over which the federal courts have original jurisdiction, the defendant may remove the case to the district court for the district in which the state court is located. 28 U.S.C. § 1441(a). A defendant may not remove a case, however, if even one defendant is a citizen of the state in which the action is brought. 28 U.S.C. § 1441(b).

With respect to cases removed to federal court from state court, 28 U.S.C. § 1447(c) provides: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." In applying 28 U.S.C. § 1447(c), federal courts have held that the removal statutes must be interpreted against removal jurisdiction and in favor of remand reasoning. As the Fourth Circuit explained, "because removal jurisdiction raises significant federalism concerns, [courts] must strictly construe removal jurisdiction." *Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir. 1994). All doubts must be resolved in favor of remanding to state court. *Md. Stadium Auth. v. Ellerbe Becket, Inc.,* 407 F.3d 255, 260 (4th Cir. 2005); *see also Larson,* at *15 (citing *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) ("A court is to presume, therefore, that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper.")).

To show fraudulent joinder, the Beachwold Defendants "must demonstrate either 'outright fraud in the plaintiff's pleading of jurisdictional facts' or that 'there is *no possibility* that the plaintiff would be able to establish a cause of action against the in-state defendant in state court.'" *Hartley v. CSX Transp., Inc.*, 187 F.3d 422, 424 (4th Cir. 1999) (emphasis in original) (quoting *Marshall v. Manville Sales Corp.*, 6 F.3d 229, 232 (4th Cir. 1993)).

The Beachwold Defendants bear "a heavy burden – [they] must show that the plaintiff cannot

9

establish a claim even after resolving all issues of law and fact in the plaintiff's favor." *Hartley*, at 424 (quoting *Marshall*, at 232-33). "This standard is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss under [Federal Rule of Civil Procedure] 12(b)(6)." *Hartley*, at 424. Indeed, **"[o]nce the court identifies [a] glimmer of hope for the plaintiff, the jurisdictional inquiry ends."** *Id.* at 426 (Emphasis added.)

Furthermore, in *Hartley,* the Fourth Circuit was explicit: "a jurisdictional inquiry is not the appropriate stage of litigation to resolve… various uncertain questions of law and fact." *Id.* at 425. "Jurisdictional rules direct judicial traffic. They function to steer litigation to the proper forum with a minimum of preliminary fuss. The best way to advance this objective is to accept the parties joined on the face of the complaint unless joinder is clearly improper." Allowing "extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules." *Id.*

## V.   ARGUMENT

### A.   The Beachwold Defendants have no basis to claim fraudulent joinder.

In their Notice, the Beachwold Defendants repeatedly argue that PestNow and the Individual Defendants should not be joined, but conspicuously fail to acknowledge the "heavy burden" that they bear. *Johnson v. Am. Towers, LLC,* 781 F.3d 693, 704 (4th Cir. 2015) (citations omitted). This "heavy burden" is crucial to keep in mind, as the Plaintiff needs only demonstrate a "glimmer of hope" to defeat the Beachwold Defendants' arguments. *Hartley,* at 426.

At page 6 of their Notice, the Beachwold Defendants cite *Cordill v. Purdue Pharma, L.P.,* a district court opinion out of the Western District of Virginia, for a watered-down version of *Hartley's* "glimmer of hope" phrase. No. 1:02CV00121, 2002 U.S. Cist. LEXIS 21476 (W.D. Va. No. 2, 2002). But *Cordill* is not the law in this Circuit. *Hartley* is. Indeed, the Fourth Circuit's holding in *Hartley* was recently re-enunciated in *Johnson v. Am. Towers,* 781 F.3d at 704. As

10

explained below, the Plaintiff easily meets *Hartley's* low standard with regard to her claims against PestNow and the Individual Defendants.

      1.    <u>Plaintiff does state a claim against PestNow, which certainly owed duties to Ms. Ghee and her sons.</u>

Virginia tort law imposed a duty on PestNow in two respects. First, Virginia law is clear that PestNow had a duty if it was "in such a position" regarding a "class of persons" that "if [it] did not use ordinary care . . . [it] would cause danger of injury" to someone within the class. *RGR, LLC v. Settle*, 288 Va. 260, 276, 279 (2014) (citations omitted); *Cf. Quisenberry v. Huntington Ingalls, Inc.*, 296 Va. 233 (2018). The Complaint alleges that PestNow was hired to treat Pinetree Apartments for termites, including Building G. As an occupant of Building G, Ms. Ghee was obviously within the "class of persons" that could be harmed if PestNow failed to use "ordinary care." PestNow would have certainly known of the risk that a failure of "ordinary care" might cause and thus, by failing to use such care, breached its duty to a class of persons that included Ms. Ghee.[6]

Second, even if PestNow did not have a duty pursuant to the ordinary duty to act reasonably, PestNow also had a duty here because it assumed a duty towards Ms. Ghee and her sons. In *Burns v. Gagnon,* 283 Va. 657, 673 (2012), the Virginia Supreme Court adopted § 324A of the Restatement (Second) of Torts. Section 324A states that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the

---

[6] The Beachwold Defendants argue without citation that PestNow could not be liable to Ms. Ghee and her sons because PestNow treated Building G three years before Ms. Ghee's family moved into the building. *See* Notice, at 11-12. This argument utterly ignores the fact that termite damage is incremental in nature. Just as a doctor's failure to diagnose an illness can cause a death three years later, a failure to treat termites will naturally lead to problems that will extend years into the future. *See Quisenberry*, 296 Va. at 245 (explaining that the mere fact that "the harm to plaintiffs did not occur contemporaneously and geographically adjacent to defendant's actions" does not suggest that the defendant had no duty). Furthermore, PestNow treated Pinetree for termites from 2019 until after the fire took place. Compl. ¶¶ 51, 55.

protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if . . . he has undertaken to perform a duty owed by the other to the third person . . . ."[7] PestNow's actions in this case fit § 324A perfectly. First, PestNow "under[took] . . . to render services to" Pinetree; second, PestNow should have recognized that its services were "necessary for the protection of a third person" such as the residents of Building G; and third, PestNow's "undertak[ing]" discharged a duty "owed by [Pinetree] to the [residents of Building G]."[8] *Burns,* at 673. Given these facts, PestNow "is subject to liability to the [residents of Building G]" for its "failure to exercise reasonable care." *Id.* Put simply, because Pinetree had a duty to the residents of Building G, and because PestNow agreed to do work for Pinetree in service of that duty, PestNow assumed a duty to residents of Building G.[9]

---

[7] Other cases affirming the assumption of duty rule or § 324A include *Kellerman v. McDonough*, 278 Va. 478, 490 (2009) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28 (1980) (referring to assumed duty principles as "ancient learning"); *Didato v. Strehler*, 262 Va. 617, 628 (2001) (applying assumption of duty principles); *Cline v. Commonwealth*, No. 151037, 2016 WL 4721393, at *2 (Va. Sup. Ct., Sept. 8, 2016) (stating "this Court has recognized the common-law principle of assumption of a duty" and applying § 324A).

[8] As landlord, Pinetree clearly had a duty to residents of Building G "to exercise ordinary care and diligence to maintain in a reasonably safe condition areas over which he has control," namely, the interior of the bedroom wall surrounding the sliding glass door in Ms. Ghee's apartment. G*ulf Reston, Inc. v. Rogers*, 215 Va. 155, 157 (1974).

[9] It is important to note here that, under Virginia law, PestNow need not have *explicitly* assumed a duty to the residents of Building G. *See Terry v. Irish Fleet, Inc.*, 296 Va. 129, 138, (2018) (explaining that, except for a duty to protect a person from third-party violence, "a duty that does not otherwise exist may be impliedly assumed from the defendant's conduct"). This point is important because *Cawlo v. Rose Hill Reserve Homeowners Ass'n*, 106 Va. Cir. 235 (Fairfax 2020), a case on which the Beachwold Defendants rely for other purposes, finds that a duty was not assumed because the defendant did not "expressly assume any duty of care." That holding squarely contradicts Virginia Supreme Court precedent and should be ignored by this Court.

12

It is important to emphasize that, where a complaint alleges an assumption of duty, the existence of the duty is a question for the jury, not the judge. *See Burns*, at 672. ("But when the issue is not whether the law recognizes a duty, but rather whether the defendant by his conduct assumed a duty, the existence of that duty is a question for the fact-finder."). Thus, the Court's role on an assumed duty claim is not to decide once and for all whether PestNow assumed a duty, but instead to simply decide whether the Complaint alleges facts from which a jury could infer PestNow assumed a duty. *Andrews v. Appalachian Power Co.*, 110 Va. Cir. 384 (2022) illustrates this point well. In that case, a woman was injured when she fell on a poorly lit sidewalk in Lynchburg, Virginia. The woman sued Appalachian Power for failing to properly maintain lighting in the area. *Id*. The plaintiff's theory of the case, like the theory advanced here, was that Lynchburg had hired Appalachian Power in service of its (the city's) non-delegable duty to maintain safe sidewalks and Appalachian Power had, by accepting the contract with the city, assumed the city's duty with regard to lighting. Relying on § 324A and Virginia precedent, the Court held that whether Appalachian Power had assumed a duty was "a fact-specific inquiry" that could not be resolved on a plea in bar and that the case should move into discovery. *Id*. The Plaintiff's claims here are just like those in *Andrews*. Pinetree had a non-delegable duty to its tenants to maintain the structural elements of its apartment complex in safe condition and hired PestNow in service of that duty. PestNow willfully assumed that duty and the Plaintiff, just as the plaintiff in *Andrews*, seeks relief from PestNow. Thus, just as the allegations of an assumed duty presented fact questions for the jury to resolve in *Andrews*, the same result should follow here. *Cf. Burns*, at 672. (whether a defendant assumed a duty "is a question for the fact-finder").

Just as powerful as *Andrews* is *Boland v. Rivanna Partners L.L.C.*, 69 Va. Cir. 308 (2005). In that case, the court was faced with the following question: "Does an independent contractor

13

hired for the season to remove snow from a parking lot have an independent duty of care to a non-contracting person who is harmed by the contractor's failure to clear the snow carefully?" Relying on § 324A and Virginia precedent, the court answered "yes" and analyzed the case similarly to *Andrews*. Just as in *Andrews* and the instant case, a landowner had a non-delegable duty to maintain its land in a safe condition and had hired in independent contractor to discharge that duty. And just as in *Andrews* and the instance case, the court held that the contractor had "an independent duty to use reasonable care because the act of clearing the parking lot was not just for the benefit of [landlord], but also for the benefit of Plaintiff and others like her. It was clearly foreseeable that people other than [the landlord] would be affected by the [contractor's] actions." Thus, under the clear principles of §324A as well as Virginia precedent, the Court should find here that the Plaintiff has sufficiently alleged an assumption of a duty.

Rather than focus its attention on the basics of tort law, the Beachwold Defendants focus on doctrines and cases that are irrelevant to this case. Their primary argument is that the "source of duty rule" bars the Plaintiff's claims. Notice, at 13-15. This argument is sorely mistaken, however. The source of duty rule is *only* relevant in cases where the plaintiff and defendant were bound together in a contractual relationship. In such cases, there arises the possibility (though not the certainty) that the defendant's duty to the plaintiff was rooted in a contractual promise rather than tort law. *See Richmond Metro. Auth. v. McDevitt St. Bovis*, 256 Va. 553, 558 (1998). Thus, where a tort claim arises from a contractual relationship, the source-of-duty rule can assist a court in determining whether the "source" of the defendant's duty to the plaintiff existed solely in contract or also existed in tort. Where a tort claim does *not* arise from a contractual relationship, however, there is no work for the source-of-duty rule to do. Ordinary car accidents between strangers, for example, never involve source of duty questions because there is no contract to

14

complicate the source of the defendant's duty. The existence of a duty in such cases is *solely* a question of ordinary tort law. It follows from this that, because the Plaintiff did not have any contractual relationship with PestNow, PestNow's duty to the Plaintiff turns entirely on ordinary rules of duty in tort law. As noted above, PestNow had a duty in two respects: (1) it was "in such a position" regarding a "class of persons" that "if [it] did not use ordinary care . . . [it] would cause danger of injury" to someone within the class, *RGR,* 288 Va. at 276, 279 (citations omitted)[10]; (2) PestNow "under[took] to perform a duty owed by" Pinetree to the residents of Building G. *Burns,* at 673 (adopting § 324A of Restatement (Second) of Torts).

In further support of their argument, the Beachwold Defendants rely heavily on *Cawlo v. Rose Hill Reserve Homeowners Ass'n*, 106 Va. Cir. 235 (Fairfax 2020), which held that an arborist hired to monitor trees for a homeowner's association did not have a duty to persons who had been harmed by a falling tree. *Cawlo*, however, is inapposite because, unlike in *Cawlo*, the Virginia Supreme Court has already held that pest control companies *do* have a duty to the occupants of properties to properly apply pesticides. *See Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 493 (2011) ("[b]ecause the Kaltmans have alleged that AAPC and Harrison breached common law and statutory duties independent of the company's contractual duty to control pests, we hold the trial court erred when it sustained the demurrers to the Kaltmans' negligence counts").[11] Indeed,

---

[10] With regard to *RGR v. Settle*, the Beachwold Defendants argue that "*RGR* is inapposite as it does not pertain to the source of duty law…" Notice, at 13. The Beachwold Defendants have it perfectly backwards, however. *RGR* is perfectly apposite here because the source of duty rule has no application.

[11] While it is true that the plaintiffs in *Kaltman* had personally hired the pest company, there is nothing within *Kaltman* that suggests that, had non-contracting parties (such the children or a houseguest of the contracting party) suffered harm along with the contracting party, claims by the non-contracting party would be barred. Indeed, such a holding would be nonsensical because the improper use of pesticide does not differentiate between the homeowners and their children or houseguests. *All* persons who inhabit a home fall within the "class of persons" that could be harmed by improper pesticide use. *RGR,* 288 Va. at 276, 279.

15

the pest company's duty in tort arose not simply from the operation of tort law, but also from Virginia Code § 3.2-3939(B) which, according to the Court in *Kaltman*, was a statute "enacted to protect the public" from mistakes committed by a pest control company. Thus, not only does Virginia tort law impose a duty on PestNow, but so too does Virginia statutory law. No such duties had any application in *Cawlo*, and the case therefore is inapposite here.

2.      Plaintiff makes specific claims against PestNow.

On pages 15 and 16 of their Notice, the Beachwold Defendants claim that a finding of termites does not prove they are Eastern Subterranean Termites. However, the Complaint includes the affidavit of termite expert Robert Kunst, who states that the most common termite in the Petersburg, Virginia, area is the Eastern Subterranean Light Termite. Compl. ¶ 50. And PestNow's corporate representative was clear at his deposition regarding the applicable termites, stating "[t]he termites that we deal with in this area [are] the eastern subterranean termite." Exhibit 3, at 51:4-5.[12] Kunst explains that these termites are often found in damp environments, such as the Blackwater Swamp adjacent to Pinetree Apartments. Compl. ¶ 50. According to Kunst, Eastern Subterranean Light Termites frequently move from one building to another, traveling an average radius of about half a mile from their nest. This range easily covers all buildings at Pinetree Apartments and extends well beyond their boundaries. *Id.*

The Beachwold Defendants also argue that in 2019, PestNow needed to find termites in or near Unit G8, not just inside Building G, which contains only eight apartments. This argument highlights the consequences of PestNow's failure to follow the termiticide label, which required PestNow to: perform exterior inspections (which PestNow often did), perform *interior* inspections (which PestNow rarely conducted), apply termiticide through holes drilled into abutting slabs

---

[12] Mr. Huber also made clear that the damage to Pinetree Apartments was caused by termites, and not other wood-destroying insects. Exhibit 3, at 87:18-88:5.

16

(which PestNow never did), and to use only Certified Applicators (which PestNow did not do). Compl. ¶¶ 53-55. A reasonable inference is that if PestNow had only used Certified Applicators at Pinetree Apartments, the Certified Applicators would have known it was essential to follow the instructions of the termiticide's label mandating the inspection of the interior of buildings whose exterior was treated and the application of the termiticide through holes drilled into abutting concrete slabs, and would have taken these important steps to eradicate the termites infesting Building G.

Additionally, regarding evidence of termites in or near Unit G8, the Complaint contains ample evidence of such. Donisha Bugg, a prior resident of Unit G8, observed "termite damage above the sliding glass door to [her] bedroom, as well as above the sliding glass door to [her] mother's bedroom." *Id.* ¶ 26; *see also id.* ¶ 26, n.3. Plaintiff's experts also found termite damage during a post-fire inspection of G6, the unit next to G8, and photographed this damage. *Id.* ¶ 113; *see also id.* ¶ 110.

Also, on page 17 of its Notice, the Beachwold Defendants assert that "Plaintiff's claim against PestNow also relies upon an unbroken continuation of the *same colony of termites* in Unit G-8 from 2019 until 2024." Notice, at 17, and discussion at 16-18 (emphasis in original). The Beachwold Defendants' arguments are unpersuasive and notably fail to cite any supporting law for their position. The Complaint makes clear that termite damage was unabated for years at the complex, to include Building G. *See* Compl. ¶¶ 6, 57 (noting that PestNow identified termites in Building G); *see also id.* ¶¶ 58-59. Further, as noted above, the prior tenant of G8 reported termite holes and termite damage near the patio sliding glass doors (the holes were subsequently covered up by the Beachwold Defendants), *id.* ¶ 26;[13] a neighbor in G4 saw termites swarming the area

---

[13] PestNow's representative testified that small holes in drywall or wood are "certainly a

17

immediately next to G8's sliding glass doors, *id*. ¶ 26, n.3; and, post-fire, termite damage and rotten wood was found in the header and the jack studs intended to support Unit G8's Primary Bedroom patio sliding glass doors, as well as the door jamb **of G6, the unit immediately adjacent to G8.** *Id*. ¶¶ 110-113. In light of the foregoing, Plaintiff has raised a question of fact for the jury to resolve and otherwise has no obligation legally or logically to identify the history and movements of any particular termite colony at Pinetree Apartments.

Defendants note Ms. Ghee did not report "any bugs, let alone termites." Notice, at 18. But this is no basis to deny the Plaintiff's Motion to Remand. First, and obviously, "bugs" are not termites, Exhibit 3, at 23:3-11, so the failure to report "bugs" is meaningless. Also, termites are generally difficult to detect for non-experts, and their damage is generally inside walls.[14] This only underscores the importance of PestNow's failure to conduct interior inspections.

Based upon the foregoing, Plaintiff clearly has more than the "glimmer of hope" needed to justify remand. *Hartley*, at 426.

3.   The Plaintiff states proper claims against the Individual Defendants.

In addition to challenging the claims against PestNow, the Beachwold Defendants also contest the claims against the Individual Defendants (Defendants McConnell, Peebles, and Yohannes). As explained below, the Beachwold Defendants' arguments fail because they cannot meet their "heavy burden" of showing that the claims have no "glimmer of hope." *Id.*

          *a.*   *The Individual Defendants were appropriately named; the Beachwold Defendants misunderstand Virginia law on the nonfeasance-malfeasance distinction; also, the Individual Defendants did cause the alleged defect.*

---

sign of termites." Exhibit 3, at 66:18-21.

[14] PestNow's website characterizes termites as "silent destroyers because they can cause thousands of dollars of damage before you realize they're there." Exhibit 3, at 52:14-53:19. The same website describes termites as "difficult to detect without professional inspections." *Id.* at 54:4-14.

18

The Beachwold Defendants first argue that "Virginia precedent" only permits employees (as opposed to non-employees) to be held liable for misfeasance, not nonfeasance. Because the Individual Defendants only committed nonfeasance, the argument goes, the claims against them must fail. Notice, at 19. This is mistaken in multiple ways. First, the employee-non-employee distinction lacks meaningful support in Virginia law. The Beachwold Defendants' argument is based on two cases, *Harris v. Morrison*, 32 Va. Cir. 298 (Richmond 1993), and *Hope v. Commonwealth*, 92 Va. Cir. 6 (Staunton 2015), but *Harris* was clearly incorrectly decided and *Hope* itself declares *Harris* to be wrong. While *Harris* admittedly states that employees may not be held liable for nonfeasance, it bases that assertion on the 1931 case *Turner v. Corneal,* 156 Va. 889 (1931), which had nothing to do with employees' liability for nonfeasance and most certainly did not promulgate a rule of tort law that turned on the defendant's status as an employee. Indeed, *no other Virginia case has ever held what Harris purports to hold*. What's more, *Harris* has been fully ignored by Virginia Courts. It has never been followed by the Virginia Supreme Court, the Court of Appeals, or any Circuit Court. In fact, it has only been cited *once* by a Virginia court, and only then to explain why it was wrong. That case was *Hope v. Commonwealth*, 92 Va. Cir. 6 (Staunton 2015), which the Beachwold Defendants cite along with *Harris*, but fail to acknowledge that the case criticizes *Harris* for (as noted above) misreading Virginia Supreme Court precedent and then refusing to follow it. *Id*. (explaining that *Harris*'s reading of *Turner v. Corneal* "is not at all what the Supreme Court held in that case").

Thus, contrary to the Beachwold Defendants' claims, "Virginia precedent" does *not* "establish[] clear boundaries" protecting employees from suit for nonfeasance. Notice, at 19. In fact, there is only a *single* Circuit Court case—*Harris*—holding as such, and that case was plainly mistaken in its reading of precedent, has never been cited approvingly by a Virginia court, and has

19

been directly called out as incorrect in another Circuit Court case (which the Beachwold Defendants cite approvingly).[15] Admittedly, there are some federal district court cases that apply a nonfeasance rule for employees, but those cases are not "Virginia precedent." Moreover, and most importantly, those rely exclusively on *Harris* as establishing an employee-non-employee distinction in tort law.[16] If *Harris*, which was only a Circuit Court decision, was wrongly decided (which it was), then these federal decisions lack a sufficient basis in Virginia law and should not be followed.  Accordingly, the Individual Defendants may be liable for nonfeasance and were appropriately named.

Even if there were some Virginia authority for the proposition that employees can only be liable for misfeasance, Plaintiff has plainly pleaded misfeasance as to both the Beachwold entities and the Individual Defendants, and thus the Individual Defendants were appropriately named. Filling in termite holes and painting over moisture, which McConnell and/or Peebles did and which Yohannes oversaw, Compl. ¶¶ 29, 130, 134-137, did nothing to eliminate the termites. It only concealed their presence, which was the goal of the Individual Defendants, and constitutes both misfeasance and fraud, "in the aggregate" or otherwise. *Tingler*, at 91.

In their Notice, the Beachwold Defendants argue that Peebles was no longer employed by them at the time of the move-in inspection. Notice, at 19. But Peebles's name is listed on the work order detailing the repairs before Ms. Ghee's move-in. Original Federal Case, ECF No. 42-1; *see also* Defendant Yohannes's deposition testimony, attached as **Exhibit 4**, at 77:11-23 (Yohannes

---

[15] To be sure, the Beachwold Defendants do cite to a couple other Virginia cases, *see* Notice, at 19-20, but none of those cases purport to distinguish between employees and non-employees and are thus irrelevant to their argument. To the extent those cases invoke the concept of non-feasance, they do so only in the context of applying the "source of duty" rule, which does not apply here because Plaintiff was not a party to any contract with the Individual Defendants.

agrees that documents show Peebles was the employee who painted over the termite holes). If the Beachwold Defendants claim that the work order was falsely completed, they may raise this argument before the jury, with its obvious implications. However, at this stage, the Plaintiff has plausibly pleaded that Peebles's actions constitute concealment and fraud.[17]

Beyond its nonfeasance/misfeasance arguments, the Beachwold Defendants offer assorted other arguments. At page 20 of their Notice, they contend that the Complaint is inadequate because it contains "generalized allegations about moisture and termite problems at Pinetree." The Beachwold Defendants seem to believe that, when a plaintiff suffers severe harm due to a sliding glass door failure caused by wood rot, a complaint that describes widespread sliding glass door failures caused by wood rot is unjustifiably "general." There is no legal basis for this argument, and the Complaint cannot be fairly described as "general." The Complaint details the systemic issues at Pinetree Apartments thoroughly, often referencing the specific units involved, Compl. ¶¶ 42-95, and establishes the direct knowledge and/or involvement of each Defendant concerning such. *Id.* ¶ 130. Moreover, despite the Beachwold Defendants' claims to the contrary, Notice at 20, the May 31, 2022 Work Orders directly connect Defendants McConnell and/or Peebles to knowledge of Unit G8's sliding door. *Id.* They painted over moisture damage and termite holes to conceal these conditions from PRHA and Ms. Ghee.

At page 21 of their Notice, the Beachwold Defendants contend that there are "alternative explanations" for the chipping paint. But PestNow's representative testified that common signs of termite infestation include "bubbling" and "blistering" of paint, as well as "little divots." Exhibit

---

[17] Moreover, the Fourth Circuit has further observed that "a jurisdictional inquiry is not the appropriate stage of litigation to resolve… various uncertain questions of law and fact." *Hartley*, at 425. "Jurisdictional rules direct judicial traffic. They function to steer litigation to the proper forum with a minimum of preliminary fuss. The best way to advance [the] objective is to accept the parties joined on the face of the complaint unless joinder is clearly improper." *Id.*

21

3, at 56:1-11, 58:11-16. Indeed, PestNow's national website explains that bubbling paint "often occurs when termites have damaged wood beneath the surface, causing moisture to build up which presents as bubbles under your paint. If the moisture continues overtime, it will lead to cracking." *Id.* at 59:22-60:13. At most, Plaintiff's contention creates a factual issue for the jury to decide.

At page 22 of their Notice, the Beachwold Defendants contend, "Plaintiff also cannot claim malfeasance because the Sliding Door was operable when [Ms. Ghee] took possession of Unit G-8." They add, the PRHA "inspector who passed Unit G-8 reported that 'Maintenance was able to get to the windows/doors to open smoothly while I was present by lubricating the seals.'" The Beachwold Defendants' contention is unpersuasive for two reasons – as discussed below, it is not factually supported, and, even if true, does not alter Plaintiff's assertions and evidence.

i. <u>The contemporaneous documents do not support the Beachwold Defendants' assertion</u>.

On May 24, 2022, PHRA employee Marrietta Paschal conducted an initial inspection of Unit G8. Compl. ¶ 27. Importantly, that was the only day that Paschal personally inspected the unit. Original Federal Case, ECF No. 50-1, at 2-5. The unit failed inspection on that day. Original Federal Case, ECF No. 50-2, at 1. A contemporaneous Inspection Checklist completed by Paschal states that the Master Bedroom (referenced herein as the "Primary Bedroom") "sliding door **can't open."** *Id.* at 3 (Emphasis added). In the second bedroom, she wrote, "chipping paint around sliding door **can't open/hard to open.**" *Id.* (Emphasis added).

Then, a week later, on May 31, 2022, Paschal marked the deficiencies she noted on May 24 as receiving "Final Approval." *Id*. However, Paschal never returned to the apartment to see the deficiencies resolved. Instead, on May 31, 2022, she received two videos from Pinetree allegedly showing repairs for chipping paint and the replacement of a locking mechanism, but not

22

demonstrating any repair to the functionality of the sliding glass doors that Paschal noted would not open. Original Federal Case, ECF No. 50-1, at 2-5.

The Beachwold Defendants cited an email written by Paschal, Notice, at 22, not from the time of Paschal's inspection of Unit G8 on May 24, 2022, but three years later. *See* Exhibit F to Beachwold Defendants' Notice. The email was sent to a PRHA executive after the agency received a subpoena *duces tecum* from Pinetree demanding materials related to the inspection of Ms. Ghee's apartment. Due to shortcomings uncovered in the inspection process, Paschal explained in her email dated June 9, 2025, "The unit initially failed 05/24/2022 due to the sliding doors in the bedrooms and window in the living room having severe chipping paint, as well as them being hard to open." Exhibit F to Beachwold Defendants' Notice. This statement aligns with her contemporaneous Inspection Checklist. Paschal then added, "Maintenance was able to get the windows/doors to open smoothly while I was present by lubricating the seals. The attached videos are what they sent[,] videos showing that the chipping paint was taken care of effective 05/31/2022." *Id.* But there is no contemporaneous evidence supporting the claim that "Maintenance was able to get the windows/doors to open smoothly while [Paschal] was present by lubricating the seals." *Id.* The contemporaneous Inspection Checklist confirms the unit failed inspection due to the deficiencies listed, including that the Primary Bedroom sliding glass door "can't open," and that these issues were not noted as resolved until May 31, 2022. Original Federal Case, ECF No. 50-2, at 3. However, on that date, Paschal never revisited the unit, and the videos she received did not demonstrate that the doors could be opened, let alone move smoothly. Original Federal Case, ECF No. 50-1, at 2-5. Therefore, the evidence shows that the Plaintiff's account of the May 24, 2022 PRHA inspection of Unit G8 is most convincing. Plaintiff has far more than a "glimmer of hope" in connection with her claims. *Hartley,* at 426.

23

ii.     Even if true, the Beachwold Defendants' contention doesn't alter Plaintiff's assertions and evidence.

Also, the Beachwold Defendants miss the point when they assert "McConnell did not do anything that prevented the Sliding Door from functioning." Notice, at 22. If he did lubricate the door, it was in the context of covering up the termite holes, related termite damage, and waterlogged supporting structure. Rather than inhibiting liability, his actions only aided in masking the true condition from Ms. Ghee.

b.     *Plaintiff does state a claim for fraud against the Individual Defendants.*

i.     Repair work in Unit G8 was fraudulently concealed.

The Plaintiff's Complaint sufficiently alleges fraud against the Individual Defendants. Painting over termite damage and moisture, which the Complaint plausibly alleges was done by Defendants McConnell and/or Peebles under Defendant Yohannes's direction, Compl. ¶¶ 29, 130, 134-137, is a clear example of fraudulent concealment.[18] The Beachwold Defendants' latest argument—that "the defect is not plausibly alleged as existing when Plaintiff took possession"—is unpersuasive and, at most, a question for the jury. Notice, at 23. This argument is based solely on the claim that the "Sliding Door moved smoothly" on June 1, 2022. Notice, at 24. At most, this was a temporary fix, and does not belie Plaintiff's assertion that rotting wood existed in the structure supporting Ms. Ghee's sliding glass door.

---

[18] Painting over termite damage for the purpose of concealing the damage is a false representation. *See Clay v. Butler*, 132 Va. 464, 474 (1922) (noting that "concealment is as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated"). Concealment can be "accomplished by word or conduct" and functions as "the equivalent of a false representation, because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth." *Spence v. Griffin*, 236 Va. 21, 28 (1988).

24

The Individual Defendants painted over, or caused to be painted over, the termite holes and moisture, and, according to Defendant McConnell's own assertion, lubricated the patio sliding glass door sufficiently to make it slide. Exhibit D to Beachwold Defendants' Notice. All of this could be done while the "compression" issue persisted at move-in. It's a temporary fix for a serious problem, similar to sending a football player back onto the field after applying a pain reliever, even though his injured knee still requires surgery. The player may finish the game, but the problem remains unresolved. At most, the Beachwold Defendants have raised a concern for an expert to evaluate. Finally, the defect could not be identified by tenants "by a cursory inspection," as the Beachwold Defendants claim. Notice, at 24. That would require understanding the systemic flashing problem, moisture issues, termite infestation, and/or wood rot throughout the complex—all of which requires resolution by a jury. Additionally, the lease prohibits Ms. Ghee from making any material alterations to the wall, let alone removing the siding of the outer wall to find the wood rot. *See* Original Federal Case, ECF No. 42-2, at 4.

ii.    Yohannes was complicit in the work in Unit G8.

Yohannes was a Regional Manager responsible for multiple properties including Pinetree Apartments. As such, she was uniquely positioned at the intersection of two streams of information: 1) an acute awareness of systemic issues such as flashing problems, moisture, termite infestations, and wood rot throughout the complex, and 2) "Ownership's" long-term efforts to sell the complex, along with its directive to limit costs to maximize the sale's profit. She regularly received numerous tenant complaints about these problems, communicated with maintenance technicians and property managers, and received many work orders detailing the issues.[19]

---

[19] Yohannes testified that she was the Regional Manager assigned to Pinetree Apartments, Exhibit 4, at 33:1-14; that she formulated the original budget for Pinetree Apartments, *id.* at 39:1-9; observed "[t]he budget would cover everything that a typical budget would cover: [i]ncome, …

25

repair and maintenance, contract services…" *id.* at 43:12-15; annually traveled to New York to present her budget, *id.* at 41:3-21, 47:10-24; visited Pinetree Apartments approximately once per week, *id.* at 55:17-19; during which she would meet with the property manager, *id.* at 55:20-22; "[r]eview financials, occupancy, walk the community, and [address] any pressing issues," *id.* at 55:23-56:1; and was aware of management's efforts to "manage AP" (accounts payable). *Id.* at 160:23-162:2.

Yohannes:

- was also aware that there was substantial turnover with property managers and numerous times Yohannes served the roles as both property manager and Regional Manager, *id.* at 57:6-59:9;

- was aware of "turnover" work – painting and repairs of apartments in anticipation of a new tenant, and observed the white board that documented those efforts, *id.* at 70:8-76:4;

- received mold and moisture complaints across all properties that she supervised, including Pinetree Apartments, which was situated next to a "swamp," *id.* at 79:18-80:4, 87:20-88:6;

- was "sure" that she "was made aware" that flashing was improperly installed if "it was entered into a proposal" (it was numerous times, *see* the discussion herein), *id.* at 80:21-25;

- "saw a number of proposals" from contractors involving replacing plywood beams and Tyvek around sliding glass doors that had been rotted out, *id.* at 81:1-5;

- noted that **"several patio door[s] or the area around several patio doors" with issues had to be replaced**, *id.* at 117:20-22 (emphasis added);

- raised the same with "upper management ownership," because of the "scope of the work and the cost[s] involved", *id.* at 81:6-12;

- characterized the same as "extraordinary expenses that would have to be approved," *id.* at 117:23-118:9;

- knew that the employee that would have given Ms. Ghee her walkthrough had been terminated for lying and cheating, *id.* at 84:9-20;

- knew that the only direct escape from the apartment bedrooms was through the same sliding glass doors that had required numerous repairs, *id.* at 85:19-86:22, 81:1-5, 109:13-25;

- generally received the tenant complaints noted in the Complaint, *id.* at 93:12-94:7, including a child getting sick from mold and growth around windows, *id.* at 127:20-24;

- admitted that it was the "owner['s]" responsibility to deal with mold, moisture, and decay inside walls, *id.* at 101:3-19;

- had received documented complaints from tenants that moisture and water issues had not been addressed for months, *id.* at 110:17-111:23, 123:17-124:12;

- coordinated the retention and repairs of many of the significant problems noted above by outside contractors, *id.* at 128:11-130:11, to include replacing rotted 4 x 4s, *id.* at 136:23-137:6; *see also id.* at 150:16-151:7; and

- was also notified of problems with termites, *id.* at 154:18-155:2, including "swarmer" termites at the complex, *id.* at 135:10-13.

26

Essentially, all the information in the Complaint was known to her or accessible to her.[20] She was also reminded by her superiors to spend as little as possible to address potentially dangerous problems. *See* generally Compl. ¶ 97, n.11. Yohannes had the authority and power to ensure repairs were completed. Her submission of budgets that ignored needed repairs and work plans that concealed moisture, termites, and wood rot was not "nonfeasance" that shields her from liability. As to the characterization of Yohannes' actions as malfeasance or misfeasance, the latter best characterizes her conduct, as she supervised Beachwold's response to the moisture issues, termite infestation and damages, and related contractor repair work. However, those efforts failed to address the wood rot and damage behind the wall in Ms. Ghee's Primary Bedroom, and, indeed, in the same area of the adjoining apartments. *See id*. ¶¶ 110-113 (noting wood rot to the door jamb of G6, the unit immediately adjacent to G8).

In addition to a duty to use ordinary care not to commit misfeasance, Yohannes, as Pinetree's Regional Manager, undoubtedly had a duty to act. She had a duty to use ordinary care to act proactively to inspect and maintain the wooden framing that held Unit G8's sliding glass door in place. *Gumenick v. United States*, 213 Va. 510, 516 (1973) (duty of landlord and its agents to make reasonable inspection of a porch and its railings[21] if , in the exercised of ordinary care, they could have discovered the defective condition and repaired it); *see also Taylor v. Virginia*

---

[20] Yohannes joined South Oxford in 2019, Exhibit 4, at 27:22-24, and immediately was assigned to a property portfolio that included Pinetree Apartments. *Id.* at 33:1-14. She would, of course, have had access to all work orders and invoices concerning the issues noted in the Complaint. *Id.* at 95:23-96:11, 93:12-94:7.

[21] As far as Yohannes's duty to inspect and maintain is concerned, the wooden framing inside the back wall of Unit G8's Primary Bedroom is comparable to the porch railings in *Gumenick*: both Unit G8's wooden framing and Gumenick's wooden railing were under the control of the landlord.

27

*Construction Corp.*, 209 Va. 76, 79 (1968) (landlord has a duty "to use ordinary care to keep such places [*i.e.*, common areas] in a reasonably safe condition").

Beachwold Defendants cite *Roll "R" Way Rinks, Inc. v. Smith*, 218 Va. 321, 325 (1977), for the claim that "prior accidents or occurrences" only give a defendant notice of a defect if they "happened at substantially the same place and under substantially the same conditions." *Roll "R" Way* actually supports the Plaintiff here. In *Roll "R" Way*, the Virginia Supreme Court held that when a plaintiff injures himself on one of several ramps leading onto the floor of a roller-skating rink, evidence of accidents on other ramps is relevant to showing the defendant's notice of a defect on the ramp where the injury occurred. *Id.* at 325-326. Here, the Plaintiff alleges there were widespread problems with wood rot throughout the Pinetree apartment complex, causing "dozens" of sliding glass door failures. Compl. ¶¶ 2, 66, 95. Consistent with *Roll "R" Way*, a reasonable fact finder could conclude that, where an apartment complex and its Regional Manager have experienced dozens of sliding glass door problems caused by wood rot, a specific sliding glass door issue from wood rot in that complex happened in "substantially the same place and under substantially the same conditions" as the others.

Finally, regarding the Beachwold Defendants' claim that "there is no intent by Yohannes as to Unit G-8," the Beachwold Defendants seek a level of specificity that is neither necessary nor relevant. A nursing home director who understaffs a ward may not always know who will be most affected, but the director recognizes that someone will be impacted nonetheless. The statement that the long-time Regional Manager did not know that water intrusion or termite damage might affect the operability of a sliding door reveals much about her honesty. Notice, at 27. Lastly, Norris' testimony on page 27 of the Opposition will be challenged by Plaintiff's experts. In fact, Plaintiff's pest control expert Robert Kunst stated in his affidavit that through his work, he is

28

"aware of instances where termite damage has interfered with the operation of sliding glass doors." Exhibit 11 to the Compl. ¶ 5. Again, at most, the Beachwold Defendants raise a question for the jury.

The Beachwold Defendants assertion that "Yohannes had no knowledge of the other units," Notice, at 28, is absolutely false, and demonstrably so, both by the written communications that she wrote and received and her own testimony. [19]*Supra*, n. 16; Compl. ¶¶ 60, 62, 94, 130. Indeed, the majority of the MBS contractor invoices detailed at note 4, *supra*, list Yohannes' email beside "Final Approve." Finally, Plaintiff doesn't understand the point that the Beachwold Defendants attempt to make at the bottom of page 28 of the Notice. As the invoices referenced above note, the damaged areas were accessed by contractors through the siding, not the drywall. *Supra*, n. 4. If Yohannes and Beachwold are attempting to make an argument that the moisture, termite, and wood rot problem did not justify any additional time or capital outlays, then that is an argument for the jury.

<em>c. Other actions against the Individual Defendants are viable.</em>

Other causes of action against the Individual Defendants complained of by the Beachwold Defendants at pages 28-29 of their Notice far exceed the "glimmer of hope" standard regarding parties joined, and therefore, the jurisdictional inquiry "ends." *Hartley,* at 426. As noted above, the Individual Defendants did owe a duty to maintain the inside of the back wall. *See Gumenick,* at 516 (holding "in the exercise of reasonable care [landlords] *and their agents* had full authority *and the duty* to make reasonable inspections of the premises and to make needed repairs.") (Emphasis added.) Also, as noted herein and the Complaint, Yohannes clearly had control over the nuisance-creating condition. As Regional Manager, Yohannes was uniquely positioned to communicate with the Beachwold Defendants any needed repairs and/or inspections. While the

29

Beachwold Defendants ultimately decided on large expenditures, Yohannes had control over informing them of the issues at Pinetree Apartments and communicating the necessity of the repairs and/or inspections. Compl. ¶¶ 130, 137. Her comments highlighted at the bottom of page 28 of the Notice give insight into her reticence to make broader, necessary repairs across the complex.

## <u>CONCLUSION</u>

For the reasons stated above, this Court should decline jurisdiction and remand the case to the Circuit Court of the City of Petersburg and provide such other relief as the Court deems appropriate.

Respectfully submitted,

NYEISHA S. GHEE

By:   <u>/s/ Mark J. Krudys</u>
        Counsel

Charles H. Cuthbert, Jr. (VSB # 14519)
Richard M. Cuthbert (VSB # 82025)
Cuthbert Law Offices,
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
(804) 733-3100
Fax: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB#30718)
Daniel Zemel (VSB#95073)
The Krudys Law Firm, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, VA, 23219
(804) 774-7950
Fax: (804) 381-4458
mkrudys@krudys.com
dzemel@krudys.com

30

**Certificate of Service**

I hereby certify that on this 20th day of March 2026, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties of record.

> ___/s/ Mark J. Krudys___
> Mark J. Krudys (VSB# 30718)
> THE KRUDYS LAW FIRM, PLC
> Truist Place, 919 East Main Street, Suite 2020
> Richmond, VA, 23219
> Phone: (804) 774-7950
> Fax: (804) 381-4458
> Email: mkrudys@krudys.com
> *Counsel for Plaintiff*