**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

NYEISHA S. GHEE,

        Plaintiff,

                                    Civil Action No.: 3:25-cv-158-RCY

v.

PINETREE APARTMENTS, LLC, *et al.,*

        Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**THE BEACHWOLD DEFENDANTS' PARTIAL MOTION TO DISMISS**

Plaintiff Nyeisha S. Ghee ("Ms. Ghee"), by counsel, files this Memorandum in Opposition to Defendant Pinetree Apartments, LLC ("Pinetree"), Beachwold Holdings, LLC, Beachwold Residential, LLC, South Oxford Management, LLC, ("South Oxford"), Nadra Yohannes, ("Yohannes"), Ricky McConnell, ("McConnell"), and Alvin Peebles's ("Peebles") (collectively the "Beachwold Defendants") Partial 12(b)(6) Motion to Dismiss Plaintiff's Complaint ("Defendants' Memorandum") (ECF No. 10), and states as follows:

**I.      FACTS DELINEATED IN THE COMPLAINT**

The state court complaint (ECF No. 1-2, hereinafter the "Complaint" or "Compl.")[1] states that Nyeisha Ghee is a single mother who raised three sons, including one with special needs, while working full-time at Walmart under financially challenging circumstances. Compl. ¶¶ 22-23. She graduated from Dinwiddie High School with the support of an Individual Education Plan

---

[1] The state court complaint (ECF No. 1-2, hereinafter "Complaint" or "Compl.") is nearly identical to the Third Amended Complaint in the original federal case, *Nyeisha S. Ghee v. Pinetree Apartments, LLC, et al.*, Civil Action No. 3:25-cv-017, E.D. Va. 2025 (hereinafter "Original Federal Case"), ECF No. 52.

and relied in part on her mother for assistance with caregiving and household expenses. *Id*. In an effort to secure safe and affordable housing for her family, Ms. Ghee applied for and received rental assistance through the Petersburg Redevelopment and Housing Authority ("PRHA"). *Id.* ¶ 24. After completing the application process, she was approved for a housing voucher and directed to a list of participating properties, including Pinetree Apartments in Petersburg, Virginia. *Id.* In June 2022, Ms. Ghee and her children moved into Unit G8, a first-floor apartment represented as a safe and suitable residence. *Id.* ¶ 25.

Unbeknownst to Ms. Ghee, Unit G8 had a documented history of significant structural issues prior to her tenancy. A previous tenant had observed termite damage and reported seeing insects believed to be termites on multiple occasions. *Id.* ¶ 26. The tenant also reported numerous holes and deterioration in the wooden framing above the sliding glass doors in both bedrooms. *Id.* Despite repeated complaints, there is no evidence that meaningful repairs were completed. *Id.* In May 2022, shortly before Ms. Ghee moved in, PRHA conducted an inspection of Unit G8 and initially failed the unit due to problems with windows and sliding doors, including difficulty opening them and visible deterioration. *Id.* ¶ 27. In response, maintenance personnel created several high-priority work orders. *Id.* ¶¶ 28-30. However, rather than addressing the underlying structural issues, management concealed damage by painting over affected areas, *id.* ¶ 29, and performing only superficial or temporary fixes. *Id.* ¶ 31. Ms. Ghee was not informed of these issues during her walkthrough of the unit and reasonably believed the apartment to be safe and habitable. *Id.* ¶ 33.

The Complaint states that the problems present in Unit G8 were not isolated but instead reflected widespread and systemic defects throughout the Pinetree Apartments complex. *Id.* ¶ 42. Built near a swamp, the complex was prone to significant moisture intrusion, which contributed to

2

persistent mold growth, wood rot, and termite infestation. *Id.* ¶ 43. Tenants across the property repeatedly reported water leaks, damp conditions, mold accumulation, and damage concentrated around patio sliding glass doors. *Id.* ¶¶ 44-47. Maintenance records, tenant complaints, and inspection reports demonstrate that these issues were longstanding and affected numerous units. *Id.*

The Complaint asserts that termite infestation was a continuing problem throughout the complex, exacerbated by the damp conditions. *Id.* ¶ 48. Pinetree contracted with PestNow to address termite activity, but the evidence indicates that PestNow consistently failed to comply with required treatment protocols under Virginia law. *Id.* ¶¶ 48-49; *see also id.* ¶¶ 53-55. As a result, termite activity persisted and continued to damage critical structural components, including the wooden framing surrounding sliding glass doors. *Id.* ¶¶ 56-58, 60-65.

Numerous inspections and contractor reports further confirmed the extent of the structural deficiencies. City code enforcement inspections identified damaged and improperly fitted sliding glass doors, as well as water-related deterioration in walls and door frames. *Id.* ¶ 67. Independent contractors repeatedly documented severe conditions, including rotten wood framing, improperly installed flashing that directed water into building interiors, and extensive mold and drywall damage. *Id.* ¶ 69. Repair work frequently required removal of siding, replacement of structural components, and correction of water intrusion pathways. *Id.* ¶¶ 70-93, 95. Despite these findings, repairs were typically limited in scope and addressed only isolated symptoms rather than the root causes of the problems. *Id.* ¶ 69.

The entities responsible for owning and managing Pinetree Apartments, collectively referred to as the Beachwold Defendants, were aware of these systemic issues but chose to minimize repair expenditures. *Id.* ¶ 96. Evidence shows that recommendations for comprehensive

3

repairs were routinely rejected in favor of less expensive, temporary solutions. *Id.* ¶¶ 97. Maintenance practices were largely reactive and piecemeal, and necessary large-scale structural corrections were not undertaken. *Id.* At the same time, the owners were attempting to sell the property and sought to maximize profitability by reducing costs. *Id.* This strategy resulted in the continued existence of hazardous conditions throughout the complex, including in Unit G8.

On the early morning of February 20, 2024, a fire broke out in Unit G8 while Ms. Ghee and her children were inside. *Id.* ¶ 103. After becoming aware of the fire, Ms. Ghee entered the living room and observed that the front exit was blocked by flames. *Id.* ¶¶ 103-104. She then made the decision to escape through the sliding glass door in the primary bedroom, which provided the only alternative exit. *Id.* ¶ 104. Holding her young son Mark, she returned to the bedroom and attempted to open the door. *Id.* ¶ 105. Although she unlocked it, she was unable to move it along its track. *Id.* She placed her son on the bed in order to use both hands, but despite repeated efforts, the door would not open. *Id.* When she turned back, her son was no longer visible in the smoke-filled room. *Id.* ¶ 106. Believing he might have escaped toward the front door, she exited the apartment and then re-entered in a desperate attempt to locate him. *Id.* ¶ 107. Ultimately, she was forced to flee the burning apartment due to the overwhelming heat and smoke. *Id.* ¶ 108. Her son did not survive. *Id.* ¶ 1.

An investigation by Plaintiff's experts revealed that the sliding glass door could not be opened due to severe structural damage concealed within the wall. *Id.* ¶ 110. Water intrusion and termite infestation had caused the wooden framing supporting the door to rot and deteriorate. *Id.* ¶ 110-112. This deterioration caused the door frame to become misaligned, preventing the door from sliding properly. *Id.* The condition was consistent with similar damage documented throughout the complex, *id.* ¶ 113, and was not visible to Ms. Ghee prior to the fire. *Id.* ¶ 38.

4

As a result of the incident, Ms. Ghee sustained catastrophic injuries. She suffered severe burns requiring multiple surgeries, including skin grafts and amputations of fingers on both hands. *Id.* ¶ 7. She experienced respiratory failure, cardiac arrest, and prolonged hospitalization, during which she underwent numerous procedures and endured significant physical and psychological trauma. *Id.* ¶¶ 115-118. She now lives with permanent disfigurement, disability, and post-traumatic stress, and is unable to return to her prior level of functioning or employment. *Id.* ¶ 119.

As the Complaint details, Pinetree Apartments was owned and operated through a network of affiliated entities, including Beachwold Holdings, Beachwold Residential, and South Oxford Management. *Id.* ¶ 120. Although Pinetree and Clearfield/Pinetree Apartments, LLC had no employees, all operational control, maintenance decisions, and financial management were handled by these related entities. *Id.* Evidence demonstrates significant overlap in personnel, resources, and decision-making authority, indicating a highly integrated structure in which upper-level management exercised control over property operations *Id.* ¶¶ 126-128.

The Complaint details evidence that further establishes that individuals throughout this organizational structure were aware of the ongoing problems at Pinetree Apartments, including termite infestation, water intrusion, and structural deterioration affecting sliding glass doors. *Id.* ¶ 130. Despite this knowledge, adequate repairs were not made. *Id.* ¶ 129. Instead, decisions were driven by cost considerations and the goal of maximizing the property's sale value. *Id.* This approach resulted in the persistence of dangerous conditions that ultimately prevented Ms. Ghee from escaping the fire with her son.

## II.   THE BEACHWOLD DEFENDANTS' "INTRODUCTION" IS BOTH INACCURATE AND UNPERSUASIVE

The Complaint contains six counts. Count I asserts a claim for common law fraud based on the Beachwold Defendants' intentional concealment of termite damage. Count II asserts a

negligence claim that overcomes any caveat emptor assertions due to the concealment of a latent defect. Count III asserts a negligence claim for failure to maintain the inside of the back wall of the Primary Bedroom, an area in Pinetree's control. Count IV asserts negligence-based claims against PestNow. Count V alleges violations of the Virginia Consumer Protection Act ("VCPA"). Count VI asserts a private nuisance claim. The Beachwold Defendants' move to dismiss all of Plaintiff's claims against them, except Count III (the failure to maintain the back wall of the Primary Bedroom). As to that count, all of the Beachwold Defendants move to dismiss it "[e]xcept" Pinetree, "and [p]possibly" South Oxford. Defendants' Memorandum (hereinafter "Memo."), at 14. The Beachwold Defendants' motion is flawed across the board, and should be denied.

The Beachwold Defendant's "Introduction" is both inaccurate and unpersuasive. First, the Beachwold Defendants' characterization of Plaintiff's 51-page, six-count Complaint as simply an "egress" claim is too simplistic. Memo. at 1. The Beachwold Defendants' effort to characterize a very courageous and quick-thinking Ms. Ghee as less than so (Pinetree states that Ms. Ghee "lost track" of Mark, "exited" the front door without her son, and "realized" that her son was still in the apartment, *id.* at 2), is not accurate. As the Complaint lays out, Ms. Ghee did all she could to care for her children in the middle of a horrifying event. Defendants' conduct impeded her heroic efforts. Also, the landlord-tenant relationship is not "controlled," as the Beachwold Defendants' contend, by the operative lease. Memo. at 2. Rather, the lease merely identifies the two parties as landlord and tenant. The common law, not the lease, delineates the landlord's tort duties to Ms. Ghee and her family.

As to Plaintiff's fraud and concealment claim, there are sufficient facts in the Complaint for a reasonable juror to conclude that the Beachwold Defendants' painted over water and termite damage. Plaintiff meets, generally without challenge by the Beachwold Defendants, the other

6

prongs of fraud. Further, contrary to Pinetree's assertions, the multitude of problems identified in the Complaint certainly does not help the Beachwold Defendants. Problems were addressed sluggishly at best and with one eye always on the cost so that the Defendants could reap the largest payoff on the sale of the complex.  And, most importantly, no repairs were ever undertaken to the rotten wood inside Ms. Ghee's back wall.  The only work that was done was to conceal the problem.

Finally, "upper management" —no entity is specified in Defendants' Memorandum—seeks dismissal of the fraud, VCPA, nuisance, and punitive damages claims by claiming that there is no allegation in the Complaint that they were aware of the specific concealment activities with Unit G8 in May and June 2022. Upper management neglects to mention that the widespread and dangerous conditions at Pinetree Apartments were regularly communicated up the line to the Ownership, who received, among other things, photos of infestations and reports of destruction. Compl. ¶¶ 97, 98, 130. Indeed, the level of specificity communicated up the chain, as revealed by the documents—no mid- or upper-level executive has yet been deposed—is stunning. Tellingly, in each instance outlined in paragraphs 69-95 of the Complaint, *every* time an outside contractor peeled back siding, and they did so a multitude of times, they found extensive damage. Yet these executives did not cease apartment operations while necessary repairs were carried out throughout the complex. They instead maintained high occupancy rates until the complex was sold, and there was no interruption to the unit prep efforts, which were akin to putting icing on a spoiled cake.

### III.    STANDARD OF REVIEW

**A.    The Plaintiff is entitled to draw all reasonable factual inferences in her favor.**

To satisfy Federal Rule of Civil Procedure 8(a)(2), a complaint simply must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding

7

the facts, the merits of a claim, or applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). A motion to dismiss for failure to state a claim may only be granted if "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitled him to relief." *Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 248 (4th Cir. 2005) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

**B.      When alleging fraud by omission or concealment, a plaintiff may partly rely on information and belief.**

Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This requires the plaintiff to allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019). However, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 401 (4th Cir. 2023) (*citing Edmonson*, 922 F.3d at 553).

Following the lead of six other circuits, the Fourth Circuit Court of Appeals in *Corder* adopted a relaxed Rule 9(b) standard for allegations of fraud by omission or concealment, reasoning that the relevant "facts will often be in the sole possession of the defendant." *Id.* at 402. Requiring the standard Rule 9(b) particularity "in such cases would 'create a Catch-22 situation.'" *Id.* (quoting *Emery v. Am. Gen. Fin., Inc.,* 134 F.3d 1321, 1323 (7th Cir. 1998)). Accordingly, "[w]hen alleging fraud by omission or concealment, plaintiffs may partly rely on information and

8

belief without running afoul of Rule 9(b)" so long as "the factual allegations that make their belief plausible" are stated. *Id*. The Fourth Circuit did not eliminate the particularity requirement for claims of fraud by omission or concealment, *id*., but it did relax the standard by allowing for some pleading by information and belief.

**IV.     ALL DEFENDANTS ARE PROPERLY JOINED**

Contrary to the Beachwold Defendants' assertions, all Defendants are properly joined. Like the Beachwold Defendants, Plaintiff incorporates all arguments she makes concerning joinder in her Motion to Remand, which she has filed today.

**V.     ARGUMENT**

**A.     Plaintiff has pled sufficient facts to demonstrate common law fraud and concealment of a latent defect.**

1.     <u>Plaintiff has stated a claim for fraud.</u>

Plaintiff must prove six elements by clear and convincing evidence to prevail on her common law fraud claim: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance thereon by the party misled, and (6) resulting damage to the party misled." *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014). Plaintiff has plausibly alleged sufficient facts as to each element.

*a.     The Beachwold Defendants made a false representation.*

Ms. Ghee has alleged that the Beachwold Defendants made a false representation—namely, they painted over damage caused by termites in the drywall and finished wood trim, to conceal the termite damage. Compl. ¶¶ 29, 134, 135. Painting over termite damage for the purpose of concealing the damage is a false representation. *See Clay v. Butler*, 132 Va. 464, 474 (1922) (noting that "concealment is as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated"). Concealment can be "accomplished by word or conduct" and

9

functions as "the equivalent of a false representation, because concealment always involves deliberate nondisclosure designed to prevent another from learning the truth." *Spence v. Griffin*, 236 Va. 21, 28 (1988).[2]

The Beachwold Defendants argue that Plaintiff's fraud assertions are limited to Defendant McConnell. Memo., at 8. The Complaint asserts that both McConnell and Peebles were listed in the work orders and/or performed the work. Compl. ¶¶ 131, 135-37. Also, to the contrary, the Complaint states that water damage and termite damage were widespread throughout the complex. *Id.* ¶¶ 2, 66, 95. All the Defendants knew that siding needed to be removed from all of the apartments and rotten wood replaced. *Id.* ¶ 69. Indeed, "rotten" wood was regularly found by contractors. *Id.* ¶¶ 69, 75-76, 78, 79, 91. Continuing to rent the apartments without taking necessary repairs meant that Beachwold Defendant maintenance technicians were regularly prepping dangerous apartments for unsuspecting tenants. Indeed, city inspectors determined the same, *id.* ¶ 67, and the Complaint incorporates video of a tenant complaining about the regular practice of technicians painting over moldy window frames. *Id.* ¶ 29, n. 5. Word of Pinetree Apartments woes made it to Beachwold's executive suites. *Id.* ¶ 98, 130. Photos of the termite infestation were received by Beachwold Residential's CEO Friedman, and another executive commented, "Wow." *Id.* The foregoing is just a small sample of the evidence detailed in the Complaint showing that Beachwold personnel outside of Petersburg were well-informed of Pinetree Apartments' problems. The Plaintiff has adequately averred fraud as to all the Beachwold Defendants.

---

[2] While Virginia law controls here, the United States Supreme Court has also "carefully explained why concealment is 'equivalent to a false representation' and so appropriately forms the basis for a common law fraud action." *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000) (quoting *Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 383, 388 (1888)).

Contrary to the Beachwold Defendants' assertions at page 9 of their Memorandum, it is reasonable to infer from the Complaint that extensive termite damage existed when the work orders concerning Ms. Ghee's apartment were completed.[3] Before Ms. Ghee took possession of Apartment G8, water had seeped into the space between the interior and exterior back walls, and termites had entered. Compl. ¶¶ 111-112. This combination of water and termites deteriorated the supporting wooden framing that held the Sliding Glass Door in place, causing it to become out of square and impeding its ability to slide. *Id*. Pinetree completed a work order for chipping paint around the exterior windows and doors of Apartment G8 the day before Ms. Ghee took occupancy. *Id.* ¶ 29. Upon information and belief, the "chipping paint" was the damage caused by termites in the finished wood trim discussed above, painted over by Pinetree to conceal the termite damage. *Id.* Ms. Ghee has sufficiently alleged in her Complaint that the Beachwold Defendants concealed a material fact from her before she took occupancy of the apartment. Under Virginia law, that means that the Beachwold Defendants were liable for any injury stemming from that defect. Pinetree does not seem to contest that point. Rather, the Beachwold Defendants assert that Ms. Ghee eventually discovered the defect and thus cannot bring a claim. That allegation is incorrect. A reasonable

---

[3] It is fair to infer that termite holes and more existed when Pinetree painted the day before Ms. Ghee took occupancy. Indeed, the previous tenant of the unit, Ms. Bugg, observed "termite damage above the sliding glass door to my bedroom, as well as above the sliding glass door to my mother's bedroom." *Id.* ¶ 26. She also noted "many small holes in the wood above the sliding glass doors" in both the Primary and Secondary bedrooms leading to the patio. *Id.* On three to four occasions, she saw insects she believed were termites. *Id.* On about four occasions, Ms. Bugg informed Pinetree of termite issues and corresponding damage in Unit G8. *Id.* However, Ms. Bugg never saw evidence that the termite damage had been repaired. *Id.* And, just two months after the fire, the sliding door's supporting wooden framing was severely deteriorated, as the Complaint's photograph at page 3 clearly shows (a putty knife stuck into badly deteriorated wood). *Id.* ¶ 3. This deterioration makes it fair to infer that the termite damage had been ongoing for years and that there were termite holes in the sliding door's finished wood trim when the work orders were being completed the day before Ms. Ghee moved in. By painting over the holes, Pinetree made a false representation.

11

person would not have discovered the defect between the walls, and therefore, Pinetree continued to owe a duty to Ms. Ghee when the fire occurred. Contrary to Defendant Pinetree's assertion, Plaintiff never learned, and could not have learned, that water and termites had caused the wooded trim supporting the sliding glass door to deteriorate because the defects were not reasonably discoverable. *Id.* ¶¶ 4, 54. Ms. Ghee merely learned, at the time that she tried sliding the door, that it was stuck. *Id.* ¶¶ 4, 54-56. She did not know, nor would any reasonable person have known, whether it was a temporary circumstance or what was causing it to stick.[4] She did not know that the problem was caused by deteriorated wood behind the sheetrock in the Primary Bedroom's back wall. Nor did she know that, as time passed, the wooden framing supporting the sliding glass door would deteriorate more and more (due to ongoing damage caused by termites and water infiltration), causing the door to become more and more out of square and more and more difficult to slide. Indeed, at page 6 of Defendant Pinetree's previously filed Memorandum in Support of Its Partial 12(b)(6) Motion to Dismiss Plaintiff's Complaint, Pinetree concedes that the photograph depicting the deteriorated wood inside the wall "displays aspects of the sliding glass door's frame that were not visible to the naked eye before the fire." Original Federal Case, ECF No. 6, at 6.

        b.     *Plaintiff satisfies the remaining five fraud prongs as well.*

---

[4] Ms. Ghee did not know, nor would a reasonable person have known, whether the door required WD-40, a more aggressive push or pull, or some other action. She did not know, nor would a reasonable person have known, that the cause of the problem was hidden below the fresh paint applied by Pinetree to cover up the evidence. Ms. Ghee did not know, nor would a reasonable person have known, that the supporting wooden frame inside the wall would only become more out of square with time. As Defendant Pinetree concealed the latent defect, it is responsible for the resulting injuries caused by the defect, including Ms. Ghee's pain, suffering, deformities, impeded abilities, and enormous medical bills.

Although they did so in previous briefing, the Beachwold Defendants no longer seriously challenge the other prongs of fraud, and Plaintiff has satisfied these prongs.[5]

2.    Plaintiff states a fraud claim against "Upper Management."

Contrary to the Beachwold Defendants' assertions, ECF No. 10, at 11-14, everyone – Maintenance Technicians McConnell, Peebles, Norris, and Lucas, Property Managers Spruill, Regional Manager Yohannes, and VPs Arruda, Glass, and DeStefano, and finally, "Ownership" Gideon Friedman, Amir Hazan, and Chuck Rubenstein all knew of moisture problems, termite infestation and damages, and associated wood rot throughout the complex. Compl. ¶ 130. Indeed, in every instance outlined in paragraphs 69 through 94 in the Complaint, *every time* private contractors pulled off siding and looked, they found some or all of the foregoing. *Id.* ¶¶ 69-94. Despite such, the Beachwold Defendants opted to not treat all the apartment buildings for termites even though it was recommended by PestNow, ¶ 99, and to repair patio and balcony sliding glass doors on a piecemeal basis. ¶¶ 69, 101. This is exactly the kind of "intentional and knowing conduct" that the Beachwold Defendants note is necessary for fraud. Memo., at 11. The Beachwold Defendants put off the repairs to cut costs and receive the largest payout possible when the complex was sold. *Id.* ¶ 97. They continued the process of readying the apartments for new tenants like Ms. Ghee – tenants who were relying upon government programs to enable them to rent the apartments. The Beachwold Defendants knew that they were providing units to tenants with dangerous

---

[5] For example, as to the materiality of the false representation that there were no termites and consequently no ongoing deterioration, Ms. Ghee, like all tenants, considered the safety of the apartment to be material when she and her three boys moved into the apartment. The fact that one of the primary exits would not function in an emergency as a result of damage inside the wall would certainly have been material to her. Compl. ¶ 136. Common sense and common experience tell us that the mere presence of ongoing termite damage is a material fact to a landlord-tenant relationship.

conditions within their walls. In their Memorandum, the Beachwold Defendants cry foul at their inclusion in this action, but these same Defendants ignored the known systemic issues at the complex and said nothing to the unsuspecting tenants like Ms. Ghee. If any of these Defendants had simply taken action to address the structural issues across the complex, they would have prevented Ms. Ghee's injuries and her son's death. Lastly, constructive fraud, unlike actual fraud, does not require a showing of intent to deceive. *See Kitchen v. Throckmorton*, 223 Va. 164, 171 (1982) (observing that "neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud.")

Contrary to the Beachwold Defendants' contentions, Memo., at 11-12, the Complaint does assert that necessary repairs for apartments were avoided. ¶¶ 96, 101, 112, 131. Plaintiff has plausibly pled that, at a minimum, all of the units at Pinetree required repairs for the incorrectly installed flashing when the complex was built, *id.* ¶ 69, but only a smattering of units were repaired over the course of years. In fact, Plaintiff notes in her Complaint that one of Pinetree's own maintenance technicians "testified that the Beachwold Defendants would only address single issues at a time, never doing the more costly but necessary larger-scale repairs." *Id.* ¶ 96. Most importantly, Ms. Ghee's unit was not repaired despite numerous indications that there was water damage, termite infestation, and termite damage inside the wall surrounding the Primary Bedroom sliding glass door. (A prior resident of Ms. Ghee's unit informed Pinetree of termite issues and corresponding damage and Pinetree never addressed the resident's concerns, *id.* ¶ 26; the unit failed inspection before Ms. Ghee moved in, *id.* ¶ 27, due to the same structural issues that Defendants knew of and saw the effects of throughout the complex, *id.* ¶ 130. Indeed, the Complaint provides a chart summarizing the Defendants' top-to-bottom awareness of the problems

14

at the complex. *Id*. At page 12 of their Memorandum, the Beachwold Defendants quibble with the significance of, and response to, the numerous problems throughout the complex. These are arguments that they can make to the jury, but are no basis for this Court to strike Plaintiff's claims.

At the bottom of page 12, Beachwold Defendants assert that Plaintiff has not "plausibly alleged that the repaired apartments were substantially similar to her apartment." They are wrong. The Complaint details that the same problems found in Ms. Ghee's unit were found throughout the complex. Compl. ¶¶ 69-95. Indeed, the moisture issues were caused, or caused in part, by incorrectly installed flashing. *Id.* ¶ 42. That observation was made by the Beachwold Defendants' own maintenance techs and was a systemic problem throughout the complex. *Id.* ¶ 69.

The Beachwold Defendants claim that Plaintiff has not plausibly alleged that "anyone (not McConnell, not Yohannes, not anyone at the Affiliated Entities) knew that the Compression Issue was possible." Memo., at 13. But the logical steps to get there are not difficult: the apartment buildings were built with 2 x 4s to provide the building support, incorrectly installed flashing directed water into the internal walls of the buildings causing the wood to break down, wet wood invites termites, and termites eat wood, causing the support of the building's structure to be compromised, leading to compression of patio sliding glass doors. Indeed, Defendants reluctantly had at least six patio sliding glass doors replaced. Compl. ¶¶ 73, 101. Additionally, Plaintiff's experts provided affidavits stating that they have seen the same type of damage in the past. The Defendants – individuals and entities were in the business of owning, managing, and leasing apartment complexes. If these Defendants wish to argue to the jury that they never considered that the foregoing conditions could impact sliding glass doors, they can make that argument to the jury, who would likely respond with great doubt to the assertion.

**C.**    **In Count III, Plaintiff has plausibly pled claims against all the Beachwold Defendants.**

In Count III, Plaintiff asserts that all the Beachwold Defendants had a duty to maintain the structural integrity of the back wall of the primary bedroom.  The Beachwold Defendants concede that Pinetree itself had such a duty, and that South Oxford "might feasibly" also have such a duty, but somehow believe that they had nothing to do with what happened at the Pinetree Apartment complex.  Memo., at 14.  What they fail to acknowledge, however, is that the Beachwold Defendants owned and operated Pinetree—which had no employees—as their own company.  Employees of the Beachwold Defendants had the power and authority to make decisions about Pinetree Apartments and did, in fact, make decisions on everyday matters such as maintenance.[6]  Thus, the Beachwold Defendants are not far removed from the harm in this case; their employees and/or agents are the ones who specifically decided to forego basic maintenance to maximize profits.  Holding a company liable for the actions of its employees or agents is not "veil piercing" (as the Beachwold Defendants suggest, *id*. at 15) but an ordinary application of respondeat superior.[7]

---

[6] The Complaint describes the "top-to-bottom awareness" of these entities concerning Pinetree Apartments' water and termite issues. Compl. ¶ 130. CEO Friedman, along with Vice Presidents, Asset Managers, South Oxford's Regional Manager, and local Maintenance Technicians and Leasing Professionals, all knew about these problems and the ownership's directive to delay repairs to maximize profits. *Id.* The Complaint further explains that employees *managed Pinetree* Apartments even though their titles stated that they worked for, and were paid by, another entity, such as South Oxford or Beachwold Residential. The Complaint further pleads facts showing that there was unified interest and ownership among Beachwold Residential, LLC, Beachwold Holdings, LLC, Clearfield/Pinetree Apartments, LLC, and South Oxford.

[7] Further evidence of the Beachwold Defendants' control over Pinetree can be found in the brief filed by Clearfield/Pinetree Apartments, LLC and Beachwold Partners, LP. In their Opposition Memorandum (ECF No. 8), they argued that that *the entities responsible for "property management" and "asset management" of all Beachwold properties, including Pinetree Apartments, are New York City-based entities Beachwold Holdings, LLC, Beachwold Residential, LLC, and South Oxford.*

16

Because the Beachwold Defendants owned Pinetree, and directed their agents and employees to make decisions about maintenance at Pinetree, the Beachwold Defendants are liable to the same degree as any landlord would be liable. Landlords, as is widely known, have a duty "to exercise ordinary care and diligence to maintain in a reasonably safe condition areas over which [they] has control," which would naturally include the interior of the bedroom wall surrounding the sliding glass door in Ms. Ghee's apartment. *Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 157 (1974); *see also Federico v. Lincoln Military Housing, LLC*, 2013 WL 5409910 *7 (E.D. Va. 2013) ("the plaintiffs have stated a viable claim of common law negligence with respect to the defendants' alleged failure to maintain those portions of the residences that remain allegedly outside the exclusive possession and control of the tenant-plaintiffs"). The duty of ordinary care involves the duty to "the duty to make reasonable inspections of the premises and to make needed repairs." *Gumenick v. United States*, 213 Va. 510, 516 (1973). The Complaint alleges that employees and/or agents of the Beachwold Defendants breached "the duty to make reasonable inspections of the premises and to make needed repairs." This allegation is sufficient to hold the Beachwold Defendants liable.

Even if the Beachwold Defendants' duty did not arise from their direct management and control of the Pinetree Apartment complex, their duty also is grounded in their assumption of Pinetree's duty. In *Burns v. Gagnon,* 283 Va. 657, 673 (2012), the Virginia Supreme Court adopted § 324A of the Restatement (Second) of Torts. Section 324A, states that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking,

17

if . . . he has undertaken to perform a duty owed by the other to the third person . . . ." [8]  Under this standard, the Beachwold Defendants clearly assumed a duty. First, the Beachwold Defendants (including Yohannes) "under[took] . . . to render services to" Pinetree; second, the Defendants should have recognized that its services were "necessary for the protection of a third person" such as the tenants of the Pinetree Apartment complex; and third, the Beachwold Defendants "undertak[ing]" discharged a duty "owed by [Pinetree] to the [residents of Pinetree Apartments]."[9] Given these facts, the Beachwold Defendants are "subject to liability to the [residents of Pinetree]" for their "failure to exercise reasonable care." *Id.* Put simply, because Pinetree had a duty to the residents of the apartment complex, and because the Beachwold Defendants performed that work for Pinetree (who had no employees of its own), the Beachwold Defendants assumed a duty to the residents of Pinetree.

Thus, there can be no doubt here that the Beachwold Defendants had a duty to the residents of Pinetree Apartments. Their employees and agents actively managed the apartment complex and, under Virginia law, owed a duty to the residents of the complex, just like any landlord would.  Even

---

[8] Other cases affirming the assumption of duty rule or § 324A include *Kellerman v. McDonough*, 278 Va. 478, 490 (2009) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28 (1980) (referring to assumed duty principles as "ancient learning"); *Didato v. Strehler*, 262 Va. 617, 628 (2001) (applying assumption of duty principles); *Cline v. Commonwealth*, No. 151037, 2016 WL 4721393, at *2 (Va. Sup. Ct., Sept. 8, 2016) (stating "this Court has recognized the common-law principle of assumption of a duty" and applying § 324A).

[9] As landlord, Pinetree clearly had a duty to residents of Building G "to exercise ordinary care and diligence to maintain in a reasonably safe condition areas over which he has control," namely, the interior of the bedroom wall surrounding the sliding glass door in Ms. Ghee's apartment.  G*ulf Reston, Inc. v. Rogers*, 215 Va. 155, 157 (1974). *See also Federico v. Lincoln Military Housing, LLC*, 2013 WL 5409910 *7 (E.D. Va. 2013) ("the plaintiffs have stated a viable claim of common law negligence with respect to the defendants' alleged failure to maintain those portions of the residences that remain allegedly outside the exclusive possession and control of the tenant-plaintiffs"); *Adams Grain & Provision Co. v. Chesapeake & O. Ry Co*, 118 Va. 500 (1916) (burst frozen pipe); *Kecoughtan Lodge No. 29, K. P. v. Stener & Kaufman*, 106 Va. 589 (1907) (burst frozen pipes).

18

if they were not positioned as the original landlord, they certainly assumed the duty of a landlord by willingly assuming control of management and maintenance responsibilities.

None of this analysis changes when the Individual Defendant Nadra Yohannes is considered. A landlord need not be a company; it can be a human being instead. When a human being such as Yohannes fails to "to make reasonable inspections of the premises and to make needed repairs," she has breached a duty of care in the same way as any corporate entity might. *Gumenick,* at 516. It is no answer here that Virginia law does not impose liability on employees (as compared to non-employees) for so-called "nonfeasance." The only Virginia case to ever reach that conclusion is the 1993 case of *Harris v. Morrison*, 32 Va. Cir. 298 (Richmond 1993), and *Harris* plainly misread Virginia precedent on that issue. *See Hope v. Commonwealth*, 92 Va. Cir. 6 (Staunton 2015) (refusing to follow *Harris* and explaining that *Harris*'s reading of Virginia precedent was erroneous). If *Harris* (which was only a Circuit Court decision that has never once been followed by another Virginia decision) was wrongly decided (which it was), then decisions based on *Harris* lack a sufficient basis in Virginia law and should not be followed.

**D.    The Complaint properly pleads a claim under the Virginia Consumer Protection Act ("VCPA").**

The VCPA was enacted "to expand the remedies afforded to consumers and to relax the restrictions imposed upon them by common law." *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014). The Supreme Court of Virginia has acknowledged the "legislature's express directive that we apply the VCPA as remedial legislation" and how this directive supports conclusions that are "more favorable to the injured plaintiff." *Ballagh v. Fauber Enters.*, 290 Va. 120, 126 (2015). Contrary to that explicit directive, the Beachwold Defendants argue that the exception to the VCPA concerning landlord-tenant transactions added by the General Assembly— an exception that specifically preserves many claims—removes the ability to bring any claim under

19

the VCPA related to landlord-tenant transactions. This interpretation contradicts the clear language of the exception and the purpose of the VCPA.

      1.      The VCPA applies to this transaction.

The Beachwold Defendants' argument that the VCPA does not apply to the consumer transaction of signing a lease holds no water. As the Defendants themselves note, the VCPA includes a specific exception for landlord-tenant transactions that prevents such claims unless there is a misrepresentation or fraudulent act or practice. Memo., at 15. This means that transactions involving a misrepresentation or fraudulent act or practice must be covered under the VCPA. The fact that the Beachwold Defendants believe the exception does not sufficiently cover or leaves too many landlord-tenant transactions within the scope of the VCPA is an issue that it may take up with the General Assembly, not something for a federal court to decide as a policy matter.

This commonsense conclusion is borne out by Virginia court decisions involving the VCPA. In *Stith v. Liberty Pointe LP*, the plaintiff alleged that the defendant "failed to provide habitable conditions at the time of leasing the unit." 110 Va. Cir. 141 (Va. Cir. Ct. 2022) (Petersburg). The court found that such an allegation properly stated a cause of action under the VCPA. Likewise, in *Guy v. Tidewater Investment Properties*, the plaintiff alleged that "fraudulent concealment and/or omissions regarding the lead paint hazards and the supposed repair of the hazard are equivalent to verbal misrepresentations of material facts" and thus they could bring a claim under the VCPA. 41 Va. Cir. 218, 230 (Va. Cir. Ct. 1996) (Norfolk). The *Guy* court also noted that "[t]he Virginia Supreme Court has continually emphasized in the fraud context that concealment can be the equivalent of an express misrepresentation." *Id*. (string citation omitted). These two rulings are consistent with the broader legal principle. *See Yong Su Park v. Gates*

20

*Hudson & Assoc.*, 83 Va. Cir. 45, 49 (Va. Cir. Ct. 2011) (Fairfax) (holding concealment of bedbug infestation stated a claim under the VCPA).

Federal courts have consistently concluded that the VCPA applies to all forms of fraud and misrepresentation within landlord-tenant transactions. In *Miller v. Charles E. Smith Management Incorporated*, the Fourth Circuit reversed a district court decision and permitted a claim against a landlord based on fraudulent misrepresentation under the VCPA. No. 96-2636, 1999 U.S. App. LEXIS 1013, *7-8 (4th Cir. Jan. 26, 1999) (unpublished). Similarly, this district reached the same conclusion in *Smith v. 4037 Lamplighter DR, LLC*, ruling that misrepresentation and deceptive practices could constitute fraud and state a claim under the VCPA, but that the plaintiff had not pled sufficient facts to establish such fraud. No. 3:24-cv-580, 2025 U.S. Dist. LEXIS 13200, *30-31 (E.D. Va. Jan. 24, 2025). In summary, the VCPA applies to this case if the Plaintiff can demonstrate that the Beachwold Defendants made a misrepresentation or otherwise committed fraud, which includes concealment.

      2.      The VCPA applies to this transaction.

As the Supreme Court of Virginia explained in *Owens v. DRS Automotive Fantomworks, Inc.*, while proof of fraud is "sufficient to establish a violation of the VCPA…the VCPA's proscription of conduct by suppliers in consumer transactions extends considerably beyond fraud." 288 Va. 489, 497 (2014). Misrepresentations, as explicitly contemplated in the landlord-tenant exception, also violate the VCPA. And unlike in issues of fraud, these misrepresentations do not necessarily have to be made "knowingly or with the intent to deceive" because if a plaintiff proves willfulness, they are entitled to treble damages. *Id.* (citing Va. Code. § 59.1-204(A)). More importantly, VCPA claims only require proof by a preponderance of the evidence, unlike the clear and convincing standard necessary for common law fraud. *Ballagh v. Fauber Enterprises*, 290 Va.

21

120, 127 (2015). Therefore, Plaintiff's fraud and VCPA claims are separate and not intertwined. For the reasons stated above, Plaintiff has adequately alleged common law fraud and has certainly met the even lower standard required for a VCPA claim.

**E.      Plaintiff has pled sufficient facts to state a claim for private nuisance.**

The Supreme Court of Virginia broadly defines the term "nuisance" as "'everything that endangers life or health, or obstructs the reasonable and comfortable use of property.'" *Collett v. Cordovana*, 290 Va. 139, 145 (2015). In *Fancher v. Fagella*, 274 Va. 549 (2007), the Supreme Court of Virginia held that the roots of a sweet gum tree located on the defendant's adjacent land could constitute a nuisance, where the invasive roots impaired the foundation of the plaintiff's house and caused the plaintiff other property damage. Similar to the unmanaged sweet gum tree roots, the Beachwold Defendants improperly installed flashing and the resulting water and termite damage—damage that the Beachwold Defendants failed to control—constituted a nuisance.

The Beachwold Defendants argue that "nuisance law is not designed to remedy a tenant for defects in a rented property." Memo., at 16. However, the nuisance at issue here was not located in the property rented by Ms. Ghee, but in property under the complete control of Pinetree and/or other renters. Flashing was improperly installed *throughout* the Pinetree complex, causing water to accumulate and attracting termites, which also spread *throughout* the complex. Compl. ¶¶ 42, 69, 51-57, 61-64. As a result of the Beachwold Defendants' penny pinching from 2019-2024 (while Pinetree sought to sell Pinetree Apartments), the nuisance foreseeably spread to Unit G8. Further, even if the nuisance somehow originated precisely within the walls of Unit G8, this is still an area *outside* Ms. Ghee's property. The Beachwold Defendants maintained complete control of the space between the interior and exterior back walls of apartment units. *Id.* ¶ 114.

22

The Beachwold Defendants' reliance on *Oliver v. Cashin*, 192 Va. 540 (1951), is misplaced. Pinetree cites *Oliver* for the proposition that "defendant landlords are not liable for plaintiff tenants… under nuisance theories." Memo., at 17 (citing *Oliver,* at 546). However, *Oliver* involved a defective condition within the demised premises where the tenant had control and responsibility over the condition. As explained, that is not the situation here.

The Beachwold Defendants then argue that the conditions causing the nuisance were open and obvious when Ms. Ghee took possession of the Unit G8, and therefore, they are not a basis for liability. *Id.* However, when Ms. Ghee took possession of Unit G8, she was not taking control of the area containing the defective condition, which was always under the Beachwold Defendants' control. Additionally, the defect was in no way "open" or "obvious," as Plaintiff claims the defective conditions were concealed and hidden from Ms. Ghee. Plaintiff also had no "means of knowing equal to the landlord" that termites and water damage were deteriorating the area in the walls around the Primary Bedroom sliding glass door. Furthermore, the invasive roots of the sweet gum tree in *Fancher v. Fagella* were open and obvious, yet they posed no barrier to recovery. 274 Va. 552.

The Beachwold Defendants contend that the Plaintiff lacks causation for a nuisance claim because "[p]rivate nuisance theory relies upon active negligence by the defendant in creating the nuisance condition." Memo., at 17 (citing *Cline v. Dunlora South, LLC*, 284 Va. 102, 109 (2012)). Here, Pinetree confuses duty and nuisance. Virginia's definition of nuisance does not mention "active" negligence. Similarly, there was no "active" negligence by the owner of the sweet gum tree in *Fancher*, yet the Supreme Court of Virginia still found the allegations stated a cause of action for nuisance. Moreover, under Section 361 of the Second Restatement of Torts, a land

23

possessor can be held liable, regardless of whether the negligence is active or passive, for physical harm caused by a dangerous condition upon that part of the land retained in the lessor's control.

The Beachwold Defendants argue that the nuisance was not caused by them but "created by termites and water damage, which are naturally occurring degenerative agents." Memo., at 17-18. But *Fancher* makes clear that the defendant in a nuisance action need not have caused the nuisance – control over the source of the nuisance will suffice. *See* 274 Va. at 549. In any event, a jury could reasonably determine that the Beachwold Defendants created the conditions for the nuisance when they improperly installed flashing continually diverted the natural flow of rainwater into the interior walls of units throughout the Pinetree complex, leading to water damage and termite infestations, which they sparingly treated and/or repaired.

As to *Cline v. Dunlora South, LLC*, *supra*, it is distinguishable because it involves damages caused by a tree falling from private property onto a public highway—a narrow fact pattern with its own unique body of Virginia law, totally different from Ms. Ghee's claims. And the same is true for *Carmello v. Cockerill*, No. 1818-22-4, 2024 Va. App. WL 3416703 (July 16, 2024), an unpublished decision of the Court of Appeals of Virginia.

**F.      Plaintiff has pled sufficient facts to state a claim for punitive damages.**

In two ways, Ms. Ghee has pled sufficient facts to justify her claim for punitive damages. First, fraud is an intentional tort. *Fox. v. Deese*, 234 Va. 412, 425 (1987). And a plaintiff who "pleads and proves an intentional tort under the common law of Virginia" may be entitled to punitive damages. *Shaw v. Titan Corp.*, 255 Va. 535, 545 (1998). Thus, because Ms. Ghee has stated a claim for common law fraud (Count I), the jury could award punitive damages to her.

Second, Pinetree, "and [p]ossibly" South Oxford have not challenged Count III. Defs' Memo., at 14.  There, and in Counts I and II, Ms. Ghee alleges that Pinetree acted in a willful and

24

wanton manner. Compl. ¶¶ 138, 145, 150. Punitive damages are proper in a negligence action when the negligence "is so willful or wanton as to evince a conscious disregard of the rights of others." *Booth v. Robertson*, 236 Va. 269, 273 (1988); *see also Green v. Ingram*, 269 Va. 281, 292 (2005). Under Virginia law, if a plaintiff proves willful and wanton conduct, the jury may award punitive damages. Whether there was conscious disregard is a question for the jury. *See Curtis v. Highfill*, 298 Va. 499, 506-07 (2020); *Booth v. Robertson*, 236 Va. at 273; *see also Green v. Ingram*, 269 Va. at 292 (holding that an award for punitive damages should not be overturned because an appellate court should defer to a jury's finding that there was conscious disregard if there is sufficient evidence to support it). In short, at this pleading stage, the allegations in the Complaint are sufficient to establish willful and wanton conduct allowing for the imposition of punitive damages.

## VI.    CONCLUSION

For these reasons, there is no merit to the Beachwold Defendants' attempts to dismiss Counts I-III, IV, and V, and the claim for punitive damages. Defendants Pinetree, and "possibly" South Oxford, do not challenge Count III. As a result, Plaintiff Ms. Ghee asks the Court to allow these claims to go forward and requests such other relief as the Court deems fit.

Respectfully submitted,

NYEISHA S. GHEE

By:    /s/ Mark Krudys
                    Counsel

Charles H. Cuthbert, Jr. (VSB # 14519)
Richard M. Cuthbert (VSB # 82025)
Cuthbert Law Offices,
A Professional Corporation
220 North Sycamore Street
Petersburg, Virginia 23803-3228
(804) 733-3100
Fax: (804) 732-4658
ccuthbert@cuthbertlaw.com
rcuthbert@cuthbertlaw.com

Mark J. Krudys (VSB#30718)
Daniel Zemel (VSB#95073)
The Krudys Law Firm, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, VA, 23219
(804) 774-7950
Fax: (804) 381-4458
mkrudys@krudys.com
dzemel@krudys.com

25

## Certificate of Service

I hereby certify that on this 20th day of March 2026, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all parties of record.

　　　　　　　　　　　　　　／s/ Mark J. Krudys
　　　　　　　　　　　　　　Mark J. Krudys (VSB# 30718)
　　　　　　　　　　　　　　The Krudys Law Firm, PLC
　　　　　　　　　　　　　　Truist Place
　　　　　　　　　　　　　　919 East Main Street, Suite 2020
　　　　　　　　　　　　　　Richmond, Virginia 23219
　　　　　　　　　　　　　　804.774.7950 Phone
　　　　　　　　　　　　　　804.381.4458 Fax
　　　　　　　　　　　　　　mkrudys@krudys.com
　　　　　　　　　　　　　　*Counsel for Plaintiff*